**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 1, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARIA LETICIA GUTIERREZ DE
LOPEZ,

      Defendant - Appellant.

No. 13-2141

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:12-CR-01083-WJ-1)**

---

Marc H. Robert, Assistant Federal Public Defender, Office of the Federal Public
Defender for the District of New Mexico, Albuquerque, New Mexico, appearing for
Appellant.

James R.W. Braun, Assistant United States Attorney (Steven C. Yarbrough, Acting
United States Attorney, with him on the brief), Office of the United States Attorney for
the District of New Mexico, Albuquerque, New Mexico, appearing for Appellee.

---

Before **KELLY, O'BRIEN,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

After a sting operation involving two confidential informants and substantial audio and video surveillance, federal law enforcement officers caught Jesus Cabral-Ramirez ("Mr. Cabral") and Defendant-Appellant Maria Gutierrez de Lopez ("Ms. Gutierrez") attempting to transport an undocumented alien from El Paso, Texas to Denver, Colorado. A federal grand jury indicted Ms. Gutierrez on one count of conspiring to transport undocumented aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).[1]

At trial, the Government elicited testimony from Border Patrol Agent Brian Knoll about the immigration status of the individual Ms. Gutierrez allegedly conspired to smuggle. Agent Knoll also provided expert testimony that transporting undocumented aliens away from U.S./Mexico border regions to the interior of the United States significantly reduces the odds of apprehension by law enforcement.

The confidential government informants—who testified anonymously[2] to protect their safety—testified about several conversations they had with Ms. Gutierrez tending to support the charges against her. Although the Government provided the defense with the informants' general criminal backgrounds, compensation records from federal agencies,

---

[1] Mr. Cabral was indicted on one count of conspiracy in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and two counts of transporting undocumented aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Although the Government tried Mr. Cabral and Ms. Gutierrez jointly, only Ms. Gutierrez is a party to this appeal.

[2] By "anonymous testimony," we mean the witnesses provided testimony without revealing their true names to the jury, Ms. Gutierrez, or defense counsel. *See* Lisa I. Karsai, *You Can't Give My Name: Rethinking Witness Anonymity in Light of the United States and British Experience*, 79 Tenn. L. Rev. 29, 33 (2011) ("Complete anonymity denies counsel, the defendant, and the public the real name or address of the witness.").

and immigration status, it did not disclose their actual identities. Defense counsel cross-examined both witnesses in light of the disclosures provided by the Government, but was unable to conduct adequate independent pre-trial investigation.

The jury convicted Ms. Gutierrez as charged, and the district court sentenced her to three years of probation. She now appeals, arguing (1) Agent Knoll's testimony about the smuggled individual's immigration status introduced inadmissible testimonial hearsay in violation of the Federal Rules of Evidence and the Confrontation Clause; (2) Agent Knoll's expert testimony about the alien-smuggling trade was not helpful to the jury under Federal Rule of Evidence 702(a); and (3) the Government's use of anonymous testimony violated the Confrontation Clause of the Sixth Amendment.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*[3]

In 2010, agents from the Federal Bureau of Investigation ("FBI") and United States Border Patrol ("Border Patrol") initiated "Operation Desert Tolls," a joint investigation into alien-smuggling organizations operating in New Mexico, western Texas, and Colorado. According to the Government, the operation received its "break" in

---

[3] The following factual history is based on the evidentiary record presented at trial.

June 2011 when agents apprehended "John Smith"[4] while he was attempting to transport

an undocumented alien. Mr. Smith, who was well-connected with the network of

smugglers in the region, began working with the FBI as a confidential informant.

In November 2011, Mr. Smith received a call from Mr. Cabral, Ms. Gutierrez's

co-defendant at trial. Mr. Cabral told Mr. Smith he would put him in touch with Ms.

Gutierrez to "arrange for work" transporting undocumented aliens in exchange for

payment. ROA, Vol. IV at 120. When Ms. Gutierrez called Mr. Smith, she informed

him that she had found a person (later identified as Eneldo Valenzuela-Carrillo) seeking

transport from El Paso, Texas to Denver, Colorado. The Government recorded various

phone conversations between Ms. Gutierrez and Mr. Smith, as well as between Mr.

Cabral and Mr. Smith, about the logistics for Mr. Valenzuela-Carrillo's paid

transportation to Colorado.[5] Ms. Gutierrez told Mr. Smith that Mr. Valenzuela-Carrillo's

family would send part of the money after he made it past the U.S. Border Patrol interior

checkpoint (located just north of Las Cruces)[6] and that they would pay the rest when he

arrived in Denver.

---

[4] "John Smith" is an alias provided by the Government to protect this confidential informant's identity.

[5] The Government did not, however, record any conversations between Ms. Gutierrez and her co-defendant Mr. Cabral.

[6] The Border Patrol operates a series of interior checkpoints located several miles north of the U.S./Mexico border. Border Patrol agents may search anyone passing

Continued . . .

On November 21, 2011, Mr. Smith picked up Mr. Valenzuela-Carrillo in El Paso and drove him to a motel in Las Cruces, New Mexico. The following day, another confidential informant, "James Jones,"[7] picked up Mr. Valenzuela-Carrillo in an 18-wheel tractor-trailer[8] and drove him to Albuquerque, New Mexico. They successfully passed through the interior checkpoint just north of Las Cruces and met Mr. Smith, who had driven his own truck to an Albuquerque rest stop. From there, Mr. Valenzuela-Carrillo again switched vehicles and left with Mr. Smith to meet Ms. Gutierrez and Mr. Cabral.

Meanwhile, Ms. Gutierrez picked up $1,500 (sent by Mr. Valenzuela-Carrillo's family) from a "MoneyCenter" at an Albuquerque Walmart.[9] Ms. Gutierrez then met with Mr. Smith, Mr. Cabral, and Mr. Valenzuela-Carrillo in the parking lot of Little

---

Cont.

through these checkpoints without particularized suspicion. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 552-53 (1976).

[7] "James Jones" is an alias provided by the Government to protect this confidential informant's identity.

[8] According to the Government, "[t]he FBI had arranged for [Mr.] Jones to drive [Mr. Valenzuela-]Carrillo to Albuquerque to make the operation appear legitimate to [Ms.] Gutierrez and [Mr.] Cabral, as undocumented aliens are commonly transported in tractor-trailers." Aplee. Br. at 6. Agent John Wardle testified at trial that "[i]n our experience, it's very common for undocumented aliens to be moved in tractor-trailers, and so that's why we used that method to try and make it look more believable." ROA, Vol. IV at 253.

[9] Video surveillance and documentary evidence introduced at trial corroborated this fact. *See* ROA, Vol. IV at 226-29, 274-75.

Anita's, an Albuquerque restaurant, to exchange the money and transfer Mr. Valenzuela-Carrillo to Mr. Cabral to transport him to Colorado.[10]  She gave $1,200 to Mr. Smith and said that Mr. Cabral would take Mr. Valenzuela-Carrillo to Denver.  Mr. Smith gave $100 to Mr. Cabral for gas.[11]

Mr. Valenzuela-Carrillo then got into Mr. Cabral's pickup truck, and they drove to a private residence in the area.  Once there, Mr. Cabral picked up some other individuals before heading north on Interstate 25.  At the FBI's request, New Mexico state police stopped the vehicle south of Santa Fe.  They took Mr. Valenzuela-Carrillo and another suspected alien into custody.  The officers did not arrest Ms. Gutierrez on that date.

B. *Procedural History*

On May 8, 2012, a federal grand jury indicted Ms. Gutierrez on one count of conspiracy to transport an undocumented alien in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).[12]  On June 7, 2012, FBI agents arrested Ms. Gutierrez.  She pled not guilty.

---

[10] Video surveillance introduced at trial captured this transaction.  *See id.* at 257-62 (discussing surveillance of Little Anita's and playing video for the jury).

[11] After the transaction, Mr. Smith gave the remaining $1,100 to Agent Brian Regan.  *See* ROA, Vol. IV at 221.

[12] The grand jury also indicted Mr. Cabral for conspiracy in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and two counts of transporting undocumented aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

At trial, the Government sought to prove Mr. Valenzuela-Carrillo, whom Ms. Gutierrez allegedly conspired to transport, was prosecuted for illegal reentry and therefore had been unlawfully present in the United States. Because the Government deported Mr. Valenzuela-Carrillo before trial, it could not call him as a witness. Instead, the Government elicited fact testimony from Senior Border Patrol Agent Knoll, who had been involved in the investigation, about Mr. Valenzuela-Carrillo's immigration status. Agent Knoll testified that authorities had processed Mr. Valenzuela-Carrillo as an undocumented alien, prosecuted him for illegal reentry, and deported him. Ms. Gutierrez objected on hearsay and Confrontation Clause grounds, but the district court overruled her objection.

Also at trial, the Government sought to prove that Ms. Gutierrez intended to "further" Mr. Valenzuela-Carrillo's illegal presence in the country by arranging transportation from El Paso, Texas, to Denver, Colorado. *See* 8 U.S.C. § 1324(a)(1)(A)(ii). Over defense counsel's objections, Agent Knoll provided expert testimony on the alien smuggling trade. He testified that the Government allocates substantially more resources to enforcing the nation's immigration laws near the southern border than in the interior of the country. Agent Knoll testified that in his experience, a smuggler would want to transport an undocumented alien away from a border town to avoid detection and decrease the chances of deportation. When asked whether, in his experience, moving away from the border would "further" an illegal alien's presence in the country, Agent Knoll responded, "Yes." ROA, Vol. IV at 359.

-7-

Finally, the Government offered testimony from the two confidential informants who had played a role in the sting operation. Because of a Mexican drug cartel's connection to the case, however, the Government asked the district court to allow them to testify anonymously to protect their personal safety. Over Ms. Gutierrez's Confrontation Clause objection, the district court agreed. The Government provided Ms. Gutierrez with background information on the confidential informants, including criminal history, compensation figures for cooperating with the FBI, and immigration status, but it refused to disclose their true identities. The two witnesses testified in open court under the aliases "John Smith" and "James Jones." They testified about their role in the transportation and their conversations with Ms. Gutierrez and Mr. Cabral, as well as Ms. Gutierrez's role in both obtaining the money and paying Mr. Smith for his efforts. On cross-examination, defense counsel elicited testimony on their criminal history, incentive to cooperate with the Government, and ties to Mexico.[13]

The jury convicted Ms. Gutierrez as charged. The district court sentenced her to three years of probation, including eight months of required radio frequency ("RF") monitoring. ROA, Vol. I at 113-14.

---

[13] In addition to the foregoing, the Government presented testimony from agents who had conducted surveillance of (1) Mr. Smith's phone calls with Ms. Gutierrez and Mr. Cabral; (2) Mr. Smith and Mr. Jones's trip from El Paso to Albuquerque with Mr. Valenzuela-Carrillo; and (3) the transfer outside Little Anita's to Mr. Cabral in exchange for $1,100. The Government admitted into evidence several audio and video recordings confirming these observations.

## II. DISCUSSION

On appeal, Ms. Gutierrez argues the district court erred in allowing (A) Agent Knoll to testify about Mr. Valenzuela-Carrillo's immigration status in violation of the Federal Rules of Evidence and the Confrontation Clause; (B) Agent Knoll to provide expert testimony on matters unhelpful to the jury in violation of Federal Rule of Evidence 702(a); and (C) the two confidential informant witnesses to testify under aliases in violation of the Confrontation Clause. We address each issue in turn.

### A. *Agent Knoll's Fact Testimony on Immigration Status*

### 1. District court proceedings

At trial, Agent Knoll testified as a fact witness about the processing of the undocumented aliens found in Mr. Cabral's car. According to Agent Knoll, he personally retrieved from the state highway patrol office the two individuals Mr. Cabral was smuggling and escorted them to Border Patrol for processing. Agent Knoll further testified that he "processed them as [he] normally would anybody encountered by the Border Patrol or another agency." ROA, Vol. IV at 331. When Agent Knoll was unable to identify the individuals by name, the prosecutor sought to refresh his recollection by briefly showing him their immigration files. Over the objections of Mr. Cabral's counsel, the district court agreed. *See* ROA, Vol. IV at 333-35.

Outside the presence of the jury, Ms. Gutierrez's counsel stated he did not "have a problem with the agent refreshing his recollection as to the names of these folks" but expressed his concern that Agent Knoll would introduce hearsay from these forms about

the individuals' immigration status. *Id.* at 335. He also joined Mr. Cabral's Confrontation Clause objection. Defense counsel then asked whether Agent Knoll would "be allowed to testify that these two folks were undocumented aliens." *Id.* at 336. The district court responded that Agent Knoll had "conducted an investigation" and asked the prosecutor what he intended to ask Agent Knoll. *Id.* The prosecutor replied that he would inquire "what happened to these individuals at the end of the processing, what was the outcome of that . . . process." *Id.* The district court then asked Agent Knoll "to [his] knowledge, what was the result of the investigation that was done regarding these two individuals you apprehended?" *Id.* at 350. Agent Knoll responded, "One went to Mexico, and the female stayed here anticipating that hearing in front of that judge." *Id.*

Ms. Gutierrez's counsel objected to "[a]nything that [Agent Knoll] is not personally aware of that represents a statement of one sort or another"—"everything that he didn't do personally that he read from a file or read off of a form that he wasn't involved in." *Id.* at 350-51. The district court overruled the objection and "allow[ed] [Agent Knoll] to testify" on the issue, concluding "the foundation has been laid for this witness who's got 28 years as a Border Patrol agent. He conducted an investigation." *Id.* at 352, 354.

After the jury returned to the courtroom, the prosecutor asked Agent Knoll what "was the outcome of your investigation?" *Id.* at 358. Agent Knoll testified that "I promised Edelmira [the other alien found in Mr. Cabral's car] for a—a hearing in front of an immigration judge sometime in the future, and she was released." *Id.* The prosecutor

asked "what happened to Mr. Carrillo-Valenzuela [sic]?" *Id.* Agent Knoll recounted,

"We called your office. Authorization for prosecution for illegal entry into the United

States was authorized, and we prosecuted him for entering the country illegally." *Id.* The

prosecutor followed up, inquiring "what happened to him after that?" *Id.* Agent Knoll

responded, "Ultimately, he was removed to Mexico." *Id.*

2. **Standard of review**

"Although we review legal interpretations of the Federal Rules of Evidence *de novo*, we review a district court's evidentiary decisions for abuse of discretion." *United States v. Griffin*, 389 F.3d 1100, 1103 (10th Cir. 2004). A district court does not abuse its discretion if its ruling "falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *United States v. Smith*, 534 F.3d 1211, 1218 (10th Cir. 2008) (quotations omitted). "[O]ur review of decisions to admit evidence over hearsay objections is especially deferential." *United States v. Dazey*, 403 F.3d 1147, 1166 (10th Cir. 2005). We review a claim of error involving the Confrontation Clause de novo. *See United States v. Kamahele*, 748 F.3d 984, 997 & n.4 (10th Cir. 2014) (citing *United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007)).

3. **Analysis**

Ms. Gutierrez argues Agent Knoll's testimony about Mr. Valenzuela-Carrillo's immigration outcome introduced testimonial hearsay in violation of the (a) Federal Rules of Evidence and (b) the Confrontation Clause. We disagree.

    a. *Personal knowledge and hearsay*

i.    Legal standard

Under the Federal Rules of Evidence, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Although the proponent bears the burden of establishing personal knowledge under Rule 602, "[e]vidence to prove personal knowledge may consist of the witness's own testimony."  *Id.*; *see also* 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6028 (2d ed. 2007) ("[P]ersonal knowledge may be established by the testimony of an in court witness without any elaborate foundation separate from the witness' description of the events in question.").

This standard is not difficult to meet.  A court should exclude testimony for lack of personal knowledge "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997) (quotations omitted); *see also* 1 Kenneth S. Broun, McCormick on Evidence § 10 n.6 (7th ed. 2013) ("[T]he foundational fact of personal knowledge under Rule 602 falls under Rule 104(b); and the trial judge plays only a limited, screening role, merely deciding whether the foundational testimony would permit a rational juror to find that the witness possesses the firsthand knowledge."); Wright & Gold, *supra* § 6022 ("[T]he testimony is excluded only if, as a matter of law, no juror could reasonably conclude that the witness perceived the facts to which she testifies.").

Accordingly, if a rational juror could conclude based on a witness's testimony that he or she has personal knowledge of a fact, the witness may testify about that fact. If, however, the witness merely has personal knowledge of an out-of-court statement offered to prove the fact asserted in that statement—but not the underlying fact—then his or her testimony must comply with the hearsay rule. *See* Fed. R. Evid. 602 advisory committee's notes (1972) (observing that Rule 602 "does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement" because the rule governing hearsay "would be applicable"). Under that rule, "hearsay" is admissible only if permitted by a "federal statute," an exception provided in the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." Fed. R. Evid. 802. The Rules define "hearsay" as an out-of-court statement offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). A "statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." *Id.* 801(a).

ii. Agent Knoll's testimony

Agent Knoll testified he was personally involved in processing Mr. Valenzuela-Carrillo and the other undocumented alien found in Mr. Cabral's vehicle. The only time he used the immigration file was to refresh his recollection of their names. When asked what happened to Mr. Valenzuela-Carrillo, Agent Knoll responded "*[w]e* called your office" and "*we* prosecuted him for entering the country illegally." ROA, Vol. IV at 358 (emphasis added). In light of this first-person testimony, a reasonable jury could

-13-

conclude he was personally involved in Mr. Valenzuela-Carrillo's successful prosecution for illegal reentry, which by definition is sufficient to establish that Mr. Valenzuela-Carrillo was not a legal resident[14]—a fact that is probative of Ms. Gutierrez's guilt for conspiring to transport undocumented aliens.

Ms. Gutierrez objected generally to Agent Knoll's lack of personal knowledge of Mr. Valenzuela-Carrillo's immigration status but declined to elicit testimony on cross-examination to support this objection. *See United States v. Rose*, 587 F.3d 695, 701 n.3 (5th Cir. 2009) ("Rose's cross-examination of Lopez focused exclusively on the calibration of the testing equipment; it did not probe whether Lopez was referring to the lab's procedures generally or whether she had personal knowledge of the tests performed in this case."). In the absence of any evidence to the contrary, Agent Knoll's testimony was sufficient to support a finding under Rule 602 that he personally observed Mr. Valenzuela-Carrillo's successful prosecution for illegal reentry. *See United States v.*

---

[14] The illegal reentry statute imposes criminal penalties on "any alien" who "has been *denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding*, and thereafter . . . enters, attempts to enter, or is at any time found in" the United States. 8 U.S.C. § 1326(a)(1) & (2) (emphasis added); *see also* 10th Cir. Criminal Pattern Jury Instructions § 2.05 (2011).

Additionally, nothing indicates Agent Knoll's testimony that Mr. Valenzuela-Carrillo ultimately "was removed to Mexico," ROA, Vol. IV at 358, was not based on his own personal observations. Regardless, because Mr. Valenzuela-Carrillo's successful prosecution for illegal reentry was enough to establish his unlawful presence in the country, it was not necessary for Agent Knoll to attest to Mr. Valenzuela-Carrillo's physical removal from the United States or any formal proceedings following the successful illegal reentry prosecution.

-14-

*Davis*, 792 F.2d 1299, 1304 (5th Cir. 1986) ("There is nothing in the record to suggest that Anderson did not, or even likely did not, have such personal knowledge. Davis had ample opportunity to cross-examine Anderson, or to take him on *voire dire*, to establish any lack of personal knowledge or opportunity for same, and he could have requested that this be done out of the presence of the jury. But he chose not to do any of this.").[15] Agent Knoll's testimony about his personal involvement in Mr. Valenzuela-Carrillo's illegal reentry prosecution indicates he did have personal knowledge of Mr. Valenzuela-Carrillo's unlawful presence in the United States.

In light of the foregoing and the deference we must pay to a district court's evidentiary rulings on hearsay objections, we conclude the district court did not abuse its discretion in determining that Agent Knoll's testimony did not introduce hearsay.

b. *Confrontation Clause*

Ms. Gutierrez argues Agent Knoll's testimony about Mr. Valenzuela-Carrillo's immigration status introduced statements from his immigration file in violation of the Confrontation Clause. The Sixth Amendment provides that "[i]n all criminal

---

[15] *See also United States v. Acosta-Acevedo*, 979 F.2d 858, at *2 (10th Cir. 1992) (unpublished table decision) (holding that testimony of INS official who had personal exposure to county's recordkeeping practices "was sufficient to support a finding of personal knowledge, especially given the defense's failure to further explore the nexus between the witness's experience and purported personal knowledge on cross-examination." (citing *Davis*, 792 F.2d at 1304-05)). Although unpublished, *Acosta-Acevedo*'s reasoning is persuasive here. *See* 10th Cir. R. 32.1 ("Unpublished opinions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. This holding applies only if the witness did not "appear at trial." *Id.* at 53.

Here, Agent Knoll did appear at trial. And as discussed above, the record supports a finding that Agent Knoll's testimony about Mr. Valenzuela-Carrillo's immigration status derived from his own observations—not those of any out-of-court declarant. Because Ms. Gutierrez's counsel had a full opportunity to cross-examine Agent Knoll about these observations, no Confrontation Clause violation occurred. *See id.* at 60 n.9 ("The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."); *see also United States v. Turner*, 709 F.3d 1187, 1191 (7th Cir. 2013) ("Block's testimony on these points, which were within his personal knowledge, posed no Confrontation Clause problem.").

\* \* \*

We affirm the district court's evidentiary rulings regarding Agent Knoll's testimony on Mr. Valenzuela-Carrillo's immigration status. The district court did not abuse its discretion by admitting the testimony.

-16-

### B. *Agent Knoll's Expert Testimony on the Alien Smuggling Trade*

## 1. **District court proceedings**

Before trial, the Government notified the defendants and the court of its intent to elicit expert testimony from Agent Knoll about the alien smuggling trade. Mr. Cabral (joined by Ms. Gutierrez) moved in limine to exclude Agent Knoll's proffered expert testimony on several grounds. The district court denied the motion, reasoning that Agent Knoll was qualified as an expert to provide opinion testimony based on his extensive experience as a senior border patrol agent, and this testimony would be both reliable and helpful to the jury.

At trial, Agent Knoll provided the following expert testimony over Ms. Gutierrez's objection:

> Q. In your experience, and I think you've testified that you've investigated hundreds of organizations that are -- are -- that have been transporting or accused of transporting illegal aliens. *Can you tell me generally if an alien-smuggling organization moves an individual from one place to another, can you tell me what reasons they might have for doing that and, if there's a principal reason, what that is*?
> A. There are two principal reasons I'll state right now. *One is to avoid contact with the Border Patrol, and the other one is to ultimately get to your destination, wherever your destination might be*.
> Q. Okay. And so and *would either of those motivations*, would either of those motivations, by virtue of what they are, *would they further that alien's illegal presence* in the United States?
> A. *Yes, abs* --
> MS. PORTER: Objection; that's a legal conclusion.
> THE COURT: Overruled.
> MR. ROBERT: Join the objection.
> THE COURT: Noted for the record.
> BY MR. CAIRNS:
> Q. You can answer the question. Would that --

A. Yes, for those illegal entry into the United States, yes.

Q. And would it *further their ability to stay here*?

A. *Yes*.

Q. All right. *Now, with regard to transporting an alien north away from the border, what impact, if any, would that have on -- on whether or not -- would that have any tendency to help the alien remain in the United States?*

A. *Yes, because when they ultimately reach their destination, they're going to be helped and supported by the family or find work or whatever their purpose is for their travel*.

Q. All right. And is there, with regard to that journey north into the interior of the country, is there -- is there less likelihood of detection, and if so, can you tell me why?

A. Yeah. The border -- most Border Patrol agents are stationed within 25 miles of the border. After the Las Cruces checkpoint, if you're familiar with the Las Cruces Border Patrol checkpoint, after that, there's very little enforcement, so they're free to drive and be transported throughout the highways of the United States.

Q. All right. And by the time they -- let me ask you this, how many Border Patrol agents approximately are in each of those three big stations down south? That would be Santa Teresa, Deming, and Lordsburg.

A. Three hundred each in approximation.

Q. And how many are here in Albuquerque?

A. Six.

Q. And how many are in Denver?

A. Zero.

ROA, Vol. IV at 358-60 (emphasis added).

2. **Legal background**

a. *Standard of review*

"We review de novo whether the district court applied the proper standard in deciding to admit or exclude expert testimony." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations omitted). "If the district court applied the correct legal standard, we then review the manner in which the court performed its gatekeeping role,

-18-

deciding whether to admit or exclude testimony, for abuse of discretion." *Id.* We may reverse only if the district court's ruling is "arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotations omitted).

b. *Legal standard*

Federal Rule of Evidence 702 establishes several requirements that must be met before presenting expert testimony. Before considering whether an expert's testimony is reliable or helpful to the jury, "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). In this case, however, we need not consider whether Agent Knoll was qualified to render an opinion because Ms. Gutierrez challenges the district court's admission of his expert testimony on helpfulness grounds alone.

Under Rule 702(a), a witness qualified as an expert may "testify in the form of an opinion" if the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This "condition goes primarily to relevance" because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (quotations omitted).

"In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Garcia*, 635 F.3d at 476-77 (quoting *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (footnote omitted)). In doing so, "courts must conduct a 'common-sense inquiry' into whether a juror would be able to understand certain evidence without specialized knowledge." *Id.* at 477 (quoting *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000)).

"Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations." *Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (quotations omitted). Ultimately, therefore, expert testimony is admissible under Rule 702(a) "if it will simply help the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[1] (Joseph M. McLaughlin, ed., Matthew Bender, 2d ed. 2014) (footnote omitted).

"Because the average juror is often innocent of the ways of the criminal underworld, expert testimony is allowed . . . to provide jurors a context for the actions of defendants." *Garcia*, 635 F.3d at 477. For example, "we routinely allow law enforcement experts with 'other specialized knowledge' to opine as to the means and

methods of the narcotics trade." *Id.* (quoting Fed. R. Evid. 702). Analogizing to this

example, we also have allowed expert testimony on firearm straw purchases and gang

operations. *See, e.g.*, *id.* ("By analogy, expert testimony that assists jurors in

distinguishing the actual purchaser of a firearm from a straw buyer is also relevant. The

average juror is as likely to be unaware of the dynamics of the illicit arms trade as of the

trade in narcotics."); *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014)

(allowing expert testimony on gang's "structure, insignia, and history"); *United States v.

Archuleta*, 737 F.3d 1287, 1297 (10th Cir. 2013) (gang testimony).

3. **Analysis**

Ms. Gutierrez argues Agent Knoll's testimony was not helpful to the trier of fact

and was therefore inadmissible under Rule 702(a).[16] We disagree.

---

[16] Ms. Gutierrez also appears to argue Agent Knoll's testimony on the "in furtherance" element of alien transporting violated Rule 704(b), which prohibits expert witnesses from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b); *see* Aplt. Br. at 18 ("The agent's testimony *told the jury how to find on the question of the defendants' intent*, and contradicted this Court's declarations on the nuances of the determination." (emphasis added)).

Her brief, however, neither cites Rule 704(b) nor develops this argument any further. We therefore consider it waived. *See* Fed. R. App. P. 28(a)(8)(A) (requiring the appellant to set forth "appellant's contentions and reasons for them, *with citations to the authorities* and part of the record *on which the appellant relies*" (emphasis added)); *Arizona Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1130 (10th Cir. 2009) ("We need not address unsupported, conclusory arguments."); *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1217 (10th Cir. 2008) ("Because Pignanelli has not directed us to any legal authority or record evidence supporting a claim for relief under the Due Process Clause of the Fourteenth Amendment, her appeal on this ground must fail.").

Continued . . .

First, Agent Knoll's testimony about the alien smuggling trade generally was permissible under Rule 702(a). He provided information about how smuggling operations work, why crossing a Border Patrol interior checkpoint is important, and the difficulty of apprehending an undocumented alien the further he or she moves away from the border. The average juror is unlikely to be aware of these details.

Although the Tenth Circuit appears not to have addressed whether expert testimony on alien smuggling and border patrol enforcement is "helpful" to the jury, other circuits have held that expert testimony on alien smuggling may assist the trier of fact in a related criminal prosecution. *See, e.g.*, *United States v. Montes-Salas*, 669 F.3d 240, 250 (5th Cir. 2012) ("The average juror may not be aware that illegal alien traffickers use 'multiple bailouts' and 'stash houses' and is likely unfamiliar with the different roles of guides, drivers, and recruiters in an illegal alien trafficking operation."); *United States v. Mejia-Luna*, 562 F.3d 1215, 1219 (9th Cir. 2009) ("The testimony assisted the jury in understanding alien smuggling schemes, their operational framework,

_____

Cont.

Even if we were to consider this argument, we would reject it. Agent Knoll's general testimony that, in his experience, movement away from the border furthers an undocumented alien's illegal presence in the country, did not discuss Ms. Gutierrez's mental state or even the specific facts of her case. It therefore left for the jury the ultimate inference on her intent. *See United States v. Richard*, 969 F.2d 849, 854-55 (10th Cir. 1992) ("Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state.").

and Mejia-Luna's particular role as a 'load' driver in the operation."). We see no reason to deviate from this approach, particularly in light of our conclusions in previous cases that expert testimony can help the jury better understand gang activity as well as the illicit drug and firearms trade. *See Kamahele*, 748 F.3d at 997-98; *Archuleta*, 737 F.3d at 1297; *Garcia*, 635 F.3d at 477 ("The average juror is as likely to be unaware of the dynamics of the illicit arms trade as of the trade in narcotics.").

Second, Agent Knoll's testimony about the "in furtherance of" element of the alien smuggling statute was permissible under Rule 702(a). Although Agent Knoll's testimony could be read to suggest that any movement away from the border "furthers" an alien's illegal presence in the country, his commentary was neither an incorrect statement of the law nor so likely to cause confusion to justify excluding it under Rule 702(a). *See United States v. Barajas-Chavez*, 162 F.3d 1285, 1289 (10th Cir. 1999) ("[A] factfinder may consider *any and all relevant evidence* bearing on the 'in furtherance of' element (time, place, distance, reason for trip, overall impact of trip, defendant's role in organizing and/or carrying out the trip)." (emphasis added)); *see also United States v. Hernandez*, 327 F.3d 1110, 1113-14 (10th Cir. 2003) (reversing judgment of acquittal on "in furtherance of" element where evidence showed defendant drove semi-truck, in which checkpoint officials discovered several undocumented aliens, from the border town of El Paso to the permanent checkpoint north of Las Cruces).

Accordingly, the district court did not abuse its discretion in admitting Agent Knoll's expert testimony. We therefore affirm on this issue.

-23-

C. *Anonymous Testimony*

1. **District court proceedings**

Before trial, the Government gave notice that it would refer to its two confidential informants by pseudonym because these "alias[es] are necessary to protect the witnesses from potential retaliation." ROA, Vol. I at 79. Although Ms. Gutierrez did not respond, she objected "to the whole notion of having anonymous witnesses" during the pre-trial conference. ROA, Vol. IV at 73. The district court overruled her objection.

The Government provided the defense with each witness's criminal history, compensation records reflecting how much money each had received working for the FBI, and immigration status. The Government did not, however, inform defense counsel of the informants' true identities.

At trial, Ms. Gutierrez objected before John Smith's direct examination (outside the presence of the jury), arguing the anonymous testimony would violate the Confrontation Clause. She asserted the Government's failure to use a curtain or voice-disguising technology in the courtroom with the witnesses "belie[d] the seriousness of the risk that [the Government] propound[s]." *Id.* at 154. When the court asked the Government to state the basis for not providing the actual identities of its witnesses, the Government responded:

> These two defendants I don't—I don't think either of these two defendants are killers. Unfortunately, this is an ongoing investigation that—that's—that—that reaches some dangerous elements down in Mexico. There are cartel connections to this case, and so while these defendants, these particular defendants are not killers, if the identity of these witnesses is

disclosed in open court or where there's a record of it, I'm concerned that
that may ultimately make it back to the cartel.

*Id.* at 128. After hearing this justification, the court allowed the Government to present

anonymous testimony from its two confidential informants.

After the Government completed its direct examination of John Smith, defense

counsel renewed his Confrontation Clause objection. When the court asked the

Government whether "[t]he basis for the confidential identity was security concerns," the

Government responded:

> Yes, Your Honor. Again, we had a similar trial, I guess it was, maybe a
> month and a half ago . . . . We proceeded in this identical fashion. Again,
> these witnesses are still operating on behalf of the United States. Well, at
> least—at least one of them is actively, and the other is—is potentially going
> to be still operating on behalf of the United States. Again, there are broader
> organizations that they are—if these identities become known at large
> through, you know, a transcript or through just open court testimony, that
> could damage the operation. That could damage investigations that may be
> underway in the future. It could also potentially damage or endanger the
> safety of the witnesses. Again, I'm not suggesting that Ms. Gutierrez de
> Lopez or Mr. Cabral are themselves threats to these witnesses. I'm not
> suggesting that.

*Id.* at 147.

After recounting a different case involving cross-border cocaine and money

laundering that resulted in the cooperating witness's decapitation, the district court

overruled Ms. Gutierrez's objection. The court concluded that nothing required the

Government "in this context" to "disclose the [witnesses'] true names" because the

Government "identified security concerns. I don't think that—I think they're valid

-25-

concerns for that [sic] these confidential informants because they've been cooperating with the government." *Id.* at 159; *see also id.* at 153-54.

During direct examination, the witnesses testified about their involvement in the sting operation and Ms. Gutierrez's role in facilitating Mr. Valenzuela-Carrillo's transportation away from the border. They further testified about the recorded conversations between themselves and Ms. Gutierrez, their unrecorded discussions with the defendant, and the exchange of money at the Albuquerque restaurant.

Ms. Gutierrez's counsel cross-examined each witness about his criminal history, compensation for cooperating with the FBI, immigration status, and ties to Mexico. Mr. Cabral's counsel elicited testimony from John Smith regarding another alien smuggling arrest that the Government failed to disclose.[17] Defense counsel's cross-examination of these two witnesses largely tracked the disclosures provided by the Government.

2. **Legal background**

We (a) first summarize the substantive legal standard governing Ms. Gutierrez's Confrontation Clause claim because it informs (b) our standard of review.

a. *Legal standard*

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

---

[17] The Government apparently neglected to provide the defense with John Smith's entire criminal history. Although the Government provided background on his attempted alien smuggling charge, it failed to disclose that he had previously been arrested (but not prosecuted) for alien smuggling on another occasion. *See* ROA, Vol. IV at 195.

against him." U.S. Const. amend. VI. The Supreme Court has identified "two broad categories" of Confrontation Clause cases. *See Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam).

"The first category reflects the [Supreme] Court's longstanding recognition that the literal right to 'confront' the witness at the time of trial forms the core of the values furthered by the Confrontation Clause." *Id.* (quotations omitted). Because Ms. Gutierrez was able to physically confront the Government's confidential informants, we focus on the "second category."

The "second category" arises when, "although some cross-examination of a prosecution witness was allowed, the trial court did not permit defense counsel to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 19 (quotations omitted). Put another way, confrontation problems arise in the second category of cases when cross-examination restrictions "effectively emasculate the right of cross-examination itself." *Id.* (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

In *Smith v. Illinois*, 390 U.S. 129 (1968), the Supreme Court held that the right of confrontation necessarily includes the right to "ask the witness who he is and where he lives" because this is "the very starting point in exposing falsehood and bringing out the truth through cross-examination" when "the credibility of a witness is in issue." *Id.* at 131 (footnotes and quotations omitted). At the same time, the Court reiterated lower courts' "duty to protect [witnesses] from questions which go beyond the bounds of proper

-27-

cross-examination merely to harass, annoy or humiliate [them]." *Id.* at 133 (quotations omitted). Justice White (joined by Justice Marshall) concurred, observing he "would place in the same category" as questions tending to harass, annoy, or humiliate "those inquiries which tend to endanger the personal safety of the witness." *Id.* at 133-34 (White, J., concurring).

Following Justice White's lead, federal courts, including this circuit, "have interpreted the Supreme Court's language concerning harassment, annoyance or humiliation to include exposure of the witness to danger." *United States v. Smaldone*, 484 F.2d 311, 318 (10th Cir. 1973) (citing cases from the Fifth and Seventh Circuits and "the cases cited therein"). In *Smaldone*, for example, we affirmed the district court's refusal to allow cross-examination about a government informant's "present address" because "there existed at least some problem of protection." *Id.* at 318. Since *Smaldone*, neither the Supreme Court nor the Tenth Circuit has squarely addressed the question presented here—whether or under what circumstances government witnesses may testify anonymously without violating the defendant's right of confrontation.

Although we have not articulated a precise standard for evaluating anonymous testimony, several other circuits have. These courts evaluate Confrontation Clause claims based on anonymous testimony by asking (i) whether the government has demonstrated a threat and if so, (ii) whether anonymous testimony deprived the defendant of an opportunity for effective cross-examination. We briefly summarize these factors before applying them to Ms. Gutierrez's case.

-28-

### i. Demonstrating a threat

First, the government must demonstrate a threat to the witness's personal safety. *See, e.g.*, *United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) ("When the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that 'the threat to the witness is actual and not a result of conjecture.'" (quoting *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969)); *Caldwell v. Minnesota*, 536 F.2d 272, 274 (8th Cir. 1976) (affirming nondisclosure of witness's address and place of employment in part because the record "contain[ed] evidence that disclosure . . . might have posed a threat to his safety"); *Palermo*, 410 F.2d at 472 (confirming that "the government bears the burden of proving to the district judge the existence of such a threat" to the witness); *United States v. Ellis*, 468 F.2d 638, 639 (9th Cir. 1972) (per curiam) (adopting procedure articulated in *Palermo* whereby Government must articulate substantial reasons to withhold information to protect witness' safety). Put another way, "if the question asked is one that is normally permissible, the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question." *Smith*, 390 U.S. at 134 (White, J., concurring). "The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling." *Id.*

This threat need not come from the defendants themselves. *See United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010) ("The appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly

-29-

from a defendant or from another source."); *accord Ramos-Cruz*, 667 F.3d at 501 (citing *Celis* with approval). But "a generalized statement" about danger—such as "*anyone* who testifies against one of [a gang's] members faces danger from [that gang]"—"would be insufficient to show that a threat against a witness was 'actual and not a result of conjecture.'" *Ramos-Cruz*, 667 F.3d at 501 (quoting *Palermo*, 410 F.2d at 472); *see also United States v. Lawler*, 413 F.2d 622, 627 n.4 (7th Cir. 1969) (disapproving of the prosecution's "unsubstantiated reference to the possible danger to the witness's safety").

In *Smaldone*, we accepted the government's justification for preventing defense counsel from eliciting the present address of the government's witness. Before trial, the government informed the trial court "that the witness had been relocated because there existed 'an apparent danger to [his] physical health and well-being.'" 484 F.2d at 319. It also "notified counsel for the defendant by letter that 'substantial reason to fear for his safety has been shown and he ([the witness]) has requested that his present whereabouts not be divulged.'" *Id.* Moreover, we observed "[t]he defendant admittedly had involvement in gambling and at the very least the court could have believed that revealing the address of the witness would stir apprehension in the mind of the witness and thereby affect his testimony." *Id.*

ii. Providing an opportunity for effective cross-examination

Second, if the government demonstrates a threat, courts then consider whether the lack of the witness's identifying information deprived the defendant of an opportunity for effective cross-examination. *See Ramos-Cruz*, 667 F.3d at 500 ("If the government

makes a showing of an actual threat, the district court still has discretion to review relevant information and determine whether disclosure of the witness's identifying information is necessary to allow effective cross-examination." (citing *Palermo*, 410 F.2d at 472)); *United States v. El-Mezain*, 664 F.3d 467, 492-93 (5th Cir. 2011) (allowing anonymous testimony because it did not deprive defendant of an opportunity for effective cross-examination); *United States v. Mohamed*, 727 F.3d 832, 838 (8th Cir. 2013) ("*Smith* requires reversal only where the lack of a witness's name and address denies a defendant an opportunity to effectively cross-examine a witness." (quotations omitted)).

"Effective cross-examination only requires that the trial judge not limit the scope of cross-examination so that it prevents the jury from having sufficient information to make a 'discriminating appraisal' of the relevant issue." *Miranda v. Cooper*, 967 F.2d 392, 402 (10th Cir. 1992) (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1559 (10th Cir. 1991)). In *Smaldone*, we affirmed the district court's cross-examination limitation restricting defense counsel from eliciting testimony about the witness's present address in part because there "was no lack of knowledge on the part of the defendant as to the background of the witness" and "[c]ounsel was allowed to cross-examine him in minute detail." 484 F.2d at 318.

"Other circuits consider various factors when determining whether a witness's use of a pseudonym denied a defendant the opportunity to effectively cross-examine the witness." *Mohamed*, 727 F.3d at 838. "These factors include whether the defendant was informed of the witness's real name before the witness testified, *Siegfriedt v. Fair*, 982

F.2d 14, 18 (1st Cir. 1992), and whether the defendant was able to cross-examine the witness on his or her background and/or credentials, *Clark v. Ricketts*, 958 F.2d 851, 854-55 (9th Cir. 1991)." *Mohamed*, 727 F.3d at 838.

The Government may provide an opportunity for effective cross-examination by disclosing a witness's real name to defense counsel while the court still allows the witness to testify under an alias, but this is not the only means to do so. Rather, courts consider disclosure of a witness's real name as part of a balancing inquiry when applying *Smith*'s exhortation to provide defense counsel with "the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132 (quotations omitted); *see Mohamed*, 727 F.3d at 838 ("*Smith* does not per se require a new trial merely because the district court sustained an objection to a question seeking to elicit [the witness's] address." (quotations omitted)); *El-Mezain*, 664 F.3d at 491 ("There is no fixed rule with respect to disclosure." (quotations omitted)); *Celis*, 608 F.3d at 830 (observing that the Supreme Court "has addressed such disclosure issues on a case-by-case basis"); *United States v. Machado-Erazo*, 951 F. Supp. 2d 148, 157 (D.D.C. 2013) ("*Celis* cautions that courts must make careful factual findings, doing everything possible to make sure that defendants receive the information that they can, but it does not create a *per se* rule of disclosure."); *United States v. Rangel*, 534 F.2d 147, 148 (9th Cir. 1976) (observing that *Smith* "does not establish a rigid rule of disclosure, but rather discusses disclosure against a background of factors weighing conversely, such as personal safety of the witness" (quotations omitted)); *see also Smaldone*, 484 F.2d at

-32-

318 (observing that *Smith*'s requirement that a defendant be allowed to cross-examine a witness about his or her address is not "invariable," particularly where it would expose "the witness to danger").

Even when the government has not disclosed witnesses' true identities to defense counsel, several circuits have concluded defendants were not deprived of an opportunity for effective cross-examination. In *Ramos-Cruz*, for example, the Fourth Circuit approved of anonymous testimony in part because the government "disclosed the substance of the testimony the two witnesses would provide at trial." 667 F.3d at 501.[18] Similarly, in *El-Mezain*, the Fifth Circuit held that the defendants had an opportunity for effective cross-examination because, "although the defense could not verify the witnesses' credentials, the district court correctly observed that the defendants had access to significant information regarding the witnesses' employment, nationalities, and backgrounds in order to conduct meaningful cross-examination." 664 F.3d at 493; *see also United States v. Watson*, 599 F.2d 1149, 1157 (2d Cir. 1979) (upholding limitations on cross-examination "to maintain [Witness Protection Program participant's] concealed identity" because defense counsel had been able to "explore[] in extensive detail his criminal background"), *amended on reh'g on other grounds*, 690 F.2d 15, *modified en*

---

[18] The Fourth Circuit also based its conclusion on the fact that the anonymous testimony "provided generalized information about the operation of MS-13" rather than an eyewitness account of "Ramos-Cruz or his activities." *Ramos-Cruz*, 667 F.3d at 501.

*banc sub nom. United States v. Muse*, 633 F.2d 1041 (2d Cir. 1980); *United States v. Navarro*, 737 F.2d 625, 634 (7th Cir. 1984) (same).

Accordingly, if the government provides defense counsel with sufficient background information on the anonymous witness (e.g., criminal history, nationality, etc.), then withholding the witness's name or address does not necessarily deprive the defendant of an opportunity for effective cross-examination, which is the touchstone of a Confrontation Clause inquiry. *See Tapia v. Tansy*, 926 F.2d 1554, 1559 (10th Cir. 1991) ("[T]he Confrontation Clause ensures the defendant the opportunity to engage in 'effective cross-examination' of the witnesses against him, but it does not include 'the power to require the disclosure of any and all information that might be useful in contradicting unfavorable testimony.'" (citations omitted) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 53 (1987) (plurality op.))); *see also United States v. Mullins*, 613 F.3d 1273, 1283 (10th Cir. 2010) ("The touchstone for whether the Confrontation Clause has been satisfied is whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." (quotations omitted)); Lisa I. Karsai, *You Can't Give My Name: Rethinking Witness Anonymity in Light of the United States and British Experience*, 79 Tenn. L. Rev. 29, 91 (2011) ("When a witness's identity is not likely to lead to impeachment material beyond that which has already been disclosed to the defendant, the ability to effectively cross-examine the witness is unlikely to be impaired by an anonymity order.").

b. *Standard of review*

"We review *de novo* whether cross-examination restrictions violate a defendant's Sixth Amendment right to confrontation." *United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir. 2005); *accord United States v. Contreras*, 536 F.3d 1167, 1172 (10th Cir. 2008). We review the district court's subsidiary assessment of the threat to a witness's safety, however, for abuse of discretion. *See United States v. Cruz*, 680 F.3d 1261, 1263 (10th Cir. 2012) ("We review the denial of a motion for disclosure of a confidential informant's identity for abuse of discretion."); *United States v. Moralez*, 908 F.2d 565, 567 (10th Cir. 1990) (same).[19]

3. **Analysis**

Ms. Gutierrez argues the district court violated the Confrontation Clause in permitting the anonymous testimony because (a) the Government failed to justify secrecy and (b) the witnesses' anonymity deprived her of an effective opportunity to cross-

---

[19] Although *Cruz* and *Moralez* dealt with motions for disclosure of non-testifying informants' identities under *Roviaro v. United States*, 353 U.S. 53 (1957), we conclude the same standard of review applies to Ms. Gutierrez's argument under *Smith* that the government's justification for maintaining secrecy at trial was insufficient under the Confrontation Clause. *See El-Mezain*, 664 F.3d at 491, 493 (reviewing Confrontation Clause challenge to cross-examination restrictions regarding pseudonymous testimony de novo but concluding the district court's "decision to preclude disclosure of the witnesses' names was not an abuse of discretion" because of "the danger to [their] personal safety"); *see also Ramos-Cruz*, 667 F.3d at 501 ("After a review of the sealed affidavits and the sealed transcript of the ex parte hearing, we cannot say that this decision was an abuse of discretion."); *Watson*, 599 F.2d at 1157 (same); *United States v. Alston*, 460 F.2d 48, 53 (5th Cir. 1972) (holding that "the trial judge did not abuse his discretion by crediting [the government witness's] hesitation [to divulge his address] and refusing to require the submission of the agent's home address").

examine them.  The Government disputes these assertions and also argues (c) any error is harmless beyond a reasonable doubt.

a. *Adequacy of justification for anonymous testimony*

First, we agree the Government failed to make an adequate showing to justify secrecy.  The district court abused its discretion in concluding otherwise.  As discussed above, circuits affirming the use of anonymous testimony have done so in part because the Government produced specific evidence of a threat.  In *Celis*, for example, the D.C. Circuit approved a protective order preventing disclosure of the witnesses' identities in part because "the government presented evidence that in Colombia the FARC[20] had killed people suspected of helping to arrest [the defendant] and had threatened to kill cooperating witnesses."  608 F.3d at 833.

Similarly, in *Ramos-Cruz*, the witnesses "specifically explained" to the district court in sealed ex parte proceedings "the heightened level of danger to which El Salvadorians who testify against MS–13[21] in U.S. courts are subject.  They then connected that threat to the specific investigative work they perform in El Salvador."  667 F.3d at 501.  On appeal, after "review[ing] [] the sealed affidavits and the sealed

---

[20] "FARC" stands for "Fuerzas Armadas Revolucionaras de Colombia," which is "the most significant drug trafficking organization in Colombia."  *Celis*, 608 F.3d at 826.

[21] "MS-13," also known as "La Mara Salvatrucha," is "an international gang formed by El Salvadorian immigrants in Los Angeles in the 1980s" that "has since expanded back into Central America, gaining prevalence in El Salvador, Honduras, Guatemala, and Mexico."  *Ramos-Cruz*, 667 F.3d at 490 & n.1.

transcript of the ex parte hearing," the Fourth Circuit concluded "the information provided to the district court indicated that the threat to these witnesses and their families, should their true identities be provided, was actual and not a result of conjecture." *Id.* (quotations omitted);

In *El-Mezain*, the Fifth Circuit concluded "there was a serious and clear need to protect the true identities of [Israeli anonymous witnesses] Avi and Major Lior" in part because "[t]he Government showed that Hamas and other terrorist organizations seek out the true identities of [Israeli Security Agency] agents and their families and publish descriptions of ISA officers on websites so that they can be targeted." 664 F.3d at 492.[22]

Here, in contrast, the Government's justification for secrecy relied on cursory "generalized statement[s]" that anyone who cooperates in a case with cartel connections faces danger. *Ramos-Cruz*, 667 F.3d at 501. In its pre-trial notice, the Government asserted, without more, that "alias[es] are necessary to protect the witnesses from

_____

[22] *See also Clark v. Ricketts*, 958 F.2d 851, 855 (9th Cir. 1991) (affirming district court's decision to conceal the witness's identity "from the jury after holding an *in camera* hearing" because the district "court learned in the *in camera* proceeding that [the witness] was a Drug Enforcement Agency informant, that threats against his life had been made in the city where he lived, and that he still had cases pending in which he would give information"); *United States v. Baker*, 419 F.2d 83, 87 (2d Cir. 1969) ("[I]n response to inquiries by the judge in the absence of the jury, Warren testified that he had received threats to his life; on one occasion Warren had heard Masciola describe how he had killed a prospective prosecution witness in another case in a New Orleans hospital. After hearing this testimony, the district judge was 'satisfied that this witness is honestly and reasonably apprehensive of danger to himself and to his family.'").

potential retaliation." ROA, Vol. I at 79.[23] At trial, the Government added briefly (and

belatedly) to its justification, observing that its witnesses were involved in "an ongoing

investigation that . . . reaches some dangerous elements down in Mexico," and expressed

concern that "if the identity of these witnesses is disclosed in open court or where there's

a record of it . . . that may ultimately make it back to the cartel." ROA, Vol. IV at 128

(mentioning "cartel connections"). The Government failed to support these generalized

assertions with sealed affidavits or any other specific evidence of a threat. *See* Oral Arg.

Recording (17:20-17:35). This fails to pass muster under the Confrontation Clause.

Although the Government may well have been able to present at least some

evidence establishing a threat to these witnesses, its efforts were minimal. It failed on the

record before us to demonstrate one. *See Ramos-Cruz*, 667 F.3d at 500; *see also*

*Palermo*, 410 F.2d at 473 (reversing because "[w]hile there was an adequate showing of a

threat to the life of [one witness], there was no showing as to [the other witness]" and

"[i]n neither case was the relevant information disclosed to the trial judge in order that he

_____

[23] Although the Government acknowledges it "certainly did" have an obligation to make a showing as to the safety concerns of these witnesses, Oral Arg. Recording (17:05-17:15), it contends defense counsel's failure to specifically object to its pre-trial notice was fatal, *see id.* (16:00-17:03, 17:35-17:46).

We disagree. At the pre-trial conference, defense counsel objected to the "whole notion" of having anonymous witnesses. ROA, Vol. IV at 73. Later at trial, defense counsel objected again on Confrontation Clause grounds and argued the open court testimony of the Government's witnesses "belie[d] the seriousness of the risk that [the Government] propound[s]." *Id.* at 154. These objections, while perhaps not as clear as they could have been, were nonetheless adequate to preserve this claim of error for appeal.

could make an informed decision"); *Lawler*, 413 F.2d at 627 n.4 (finding defendant was

not prejudiced by cross-examination limitation but "plac[ing] no special reliance on the

unsubstantiated reference to the possible danger to the witness's safety").

We therefore conclude the district court abused its discretion in determining the

Government adequately justified secrecy. *See Clyma v. Sunoco, Inc.*, 594 F.3d 777, 783

(10th Cir. 2010) ("[A] 'clear example of an abuse of discretion exists where the trial court

fails to consider the applicable legal standard or the facts upon which the exercise of its

discretionary judgment is based.'" (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537

(10th Cir. 1997)).[24]

b. *Opportunity for effective cross-examination*

Second, despite the Government's inadequate justification for secrecy, Ms.

Gutierrez was not deprived of an opportunity for effective cross-examination of the

Government's confidential informants.

---

[24] We acknowledge that proffering specific evidence of a threat before trial may implicate many of the same security concerns underlying the desire to maintain anonymity at trial. District courts have various tools to address such concerns and may, for example, as other courts have done, consider evidence of specific threats *in camera* before allowing anonymous testimony. *See, e.g.*, *Ramos-Cruz*, 667 F.3d at 501 (affirming anonymous testimony based in part on district court's *in camera* proceedings); *United States v. Olson*, 978 F.2d 1472, 1476-77 (7th Cir. 1992) (same); *Clark*, 958 F.2d at 855 (same); *Watson*, 599 F.2d at 1157 (same); *cf. Moralez*, 908 F.2d at 569 ("Although we leave to the discretion of the trial court how best to conduct these proceedings and assess the relevance of the informant's testimony, the *in camera* hearings should be transcribed and sealed to permit meaningful review while retaining limited disclosure." (quotations omitted)).

Although the Government withheld these witnesses' true identities from the defense, Ms. Gutierrez was still able to face them before the jury. Moreover, the Government provided defense counsel with significant impeachment material on each witness, including their prior arrests, compensation schedule for cooperating with the DEA, and immigration status. Armed with this material, defense counsel questioned John Smith about: his prior charge for transporting aliens, which the Government dismissed in exchange for his cooperation; his compensation for assisting the Government, which amounted to roughly $8,000; his family ties to Chihuahua, Mexico; and his retaining his green card in exchange for cooperating. *See* ROA, Vol. IV at 162-68. Defense counsel also questioned James Jones regarding: his being paroled into the United States while assisting the government; his compensation for cooperating with the Government, which amounted to roughly $2,000; and his family ties to Chihuahua, Mexico. *See id.* at 205-12.

Although Mr. Cabral's counsel elicited testimony from John Smith about an undisclosed arrest, the Government's inadvertent failure to disclose this fact did not deprive Ms. Gutierrez of an opportunity for effective cross-examination. The Government's other disclosures provided defense counsel "the opportunity to place the witness[es] in [their] proper setting and put the weight of [their] testimony and [their] credibility to a test." *Smith*, 390 U.S. at 132. Defense counsel's cross-examination regarding the other disclosures provided by the Government gave the jury "sufficient information to make a 'discriminating appraisal' of the relevant issue," *Cooper*, 967 F.2d

at 402 (quotations omitted)—here, the witnesses' credibility. *See United States v. Alaniz*, 726 F.3d 586, 611 (5th Cir. 2013) (affirming restrictions on anonymous testimony because "cross-examination provided the jury with ample insight into CS1 and CS2's respective associations and criminal pasts, and possibly self-interested motivations for cooperating with the government."); *El-Mezain*, 664 F.3d at 493 (concluding that "although the defense could not verify the witnesses' credentials, the district court correctly observed that the defendants had access to significant information regarding the witnesses' employment, nationalities, and backgrounds in order to conduct meaningful cross-examination"); *United States v. Olson*, 978 F.2d 1472, 1477 (7th Cir. 1992) ("Notable in this case is the ample opportunity defendants had to impeach Fessler's testimony. They were able to bring out a prior felony conviction, a misdemeanor conviction for fraud, perjury, and receipt of payment for testimony." (footnote omitted)).

In light of the foregoing, the Government's refusal to disclose the witnesses' true identities did not deprive Ms. Gutierrez of an opportunity for effective cross-examination. *See Van Arsdall*, 475 U.S. at 679 ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (quoting *Fensterer*, 474 U.S. at 20)); *United States v. McHorse*, 179 F.3d 889, 900 (10th Cir. 1999) ("[T]he demands of the

Confrontation Clause are satisfied where a defendant has the opportunity to reveal

weaknesses in the witness' testimony."). [25]

    c. *Harmless error*

Despite the Government's failure to demonstrate a threat to its witnesses' safety,

we conclude this error was harmless. The Government's disclosures provided an

opportunity for effective cross-examination, and the remaining evidence against Ms.

Gutierrez established substantial corroboration. *See Ellis*, 468 F.2d at 639 ("While the

procedures suggested in *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969),

should ordinarily be followed in such circumstances, we conclude, in view of the

marginal significance of the witness's testimony in this case, that no prejudice to the

defendant can be shown."); *Lawler*, 413 F.2d at 627 ("In view of the extensive cross-

examination of [the witness] permitted defendant's counsel and the fact that the bulk of

---

[25] Despite this conclusion, we note that in the appropriate case, disclosing a witness's true identity to defense counsel through a protective order that still allows the witness to testify under an alias may help ensure an adequate opportunity for effective cross-examination without jeopardizing witness safety. *See, e.g.*, *Celis*, 608 F.3d at 829, 832-33 (affirming district court's use of a protective order that "allowed the witnesses from Colombia to testify under pseudonyms but required the government to disclose the witnesses' true identities to defense counsel"); *United States v. Sterling*, 724 F.3d 482, 516-17 (4th Cir. 2013) (finding "no abuse of discretion in the district court's decision to make available to Sterling and his counsel a key to the witnesses' true names" but reversing the district court's order "that the jury be given a key" because the panel "discern[ed] no real benefit that would inure from providing the jury with the full, true names of the CIA operatives at issue"), *cert. denied sub nom. Risen v. United States*, 134 S. Ct. 2696 (2014). Indeed, at oral argument, the Government conceded that such a protective order "certainly could have been done in this case" and "probably would not be a problem." Oral Arg. Recording (25:23-25; 25:55-58).

the testimony damaging to [the defendant] was presented by the narcotics agents, we hold that on the facts of the present case defendant suffered no prejudicial denial of the right to confrontation and effective cross-examination.").

"Violations of the Confrontation Clause are subject to harmless error analysis, under which the beneficiary of a constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the guilty verdict." *United States v. Chavez*, 481 F.3d 1274, 1277 (10th Cir. 2007) (quotations omitted). "We review the record de novo." *Id.* "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684.

In conducting this inquiry, we "consider various factors, including 'the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *United States v. Woodard*, 699 F.3d 1188, 1198 (10th Cir. 2012) (quoting *Van Arsdall*, 475 U.S. at 684).

Here, after carefully reviewing the record, we conclude these factors demonstrate the error in failing to require a greater showing of threat was harmless beyond a reasonable doubt. First, although Mr. Smith and Mr. Jones provided a fact-based

narrative of their conversations with the defendants and their trip from El Paso to Albuquerque, their testimony ultimately was not essential to the Government's case. The other evidence presented by the Government—which included video and audio surveillance as well as agent testimony—was enough to secure a conviction beyond a reasonable doubt. *See United States v. Brown*, 482 F.2d 1226, 1229 (8th Cir. 1973) (affirming cross-examination limitations in part because "even if the credibility of the witness was [further] impugned, the Government's case in chief did not rest upon the credibility of this witness alone"); *cf. Olden v. Kentucky*, 488 U.S. 227, 233 (1988) (per curiam) (holding that confrontation clause violation was not harmless beyond a reasonable doubt in part because it concerned the limitation of cross-examination of the prosecution's key witness).

Second, much of Mr. Smith and Mr. Jones's testimony was cumulative of the Government's own surveillance observations. *See also United States v. Williams*, 576 F.3d 1149, 1163 (10th Cir. 2009) (finding limitation on cross-examination harmless in part because "overlapping and equally damaging testimony was provided by other witnesses")

Third, on every material point of Mr. Smith and Mr. Jones's testimony, the Government presented considerable corroborating evidence. Agent John Wardle testified about the FBI and Border Patrol's round-the-clock surveillance of Mr. Smith and Mr. Jones during their transfer of Mr. Valenzuela-Carrillo from El Paso to Albuquerque by way of Las Cruces. *See* ROA, Vol. IV at 247-48, 257. The Government introduced

recorded telephone conversations between Ms. Gutierrez and Mr. Smith and between Mr. Cabral and Mr. Smith in which they discussed logistics and the terms of the deal. *See* ROA, Vol. IV at 232, 238-46, 249-52, 254-56. The Government introduced a receipt for $1,500 from the Walmart MoneyCenter bearing Ms. Gutierrez's name and played video showing Ms. Gutierrez at the Walmart MoneyCenter shortly before she joined the rest of the group outside Little Anita's, the Albuquerque restaurant where Mr. Smith handed off Mr. Valenzuela-Carrillo to Mr. Cabral in exchange for $1,100 from Ms. Gutierrez. *See id.* at 227-28 (authenticating video), 271-75 (providing commentary). The Government played a video recording of the Little Anita's meeting between Ms. Gutierrez, Mr. Smith, and Mr. Cabral, and Agent Brian Regan testified that he received $1,100 cash from Mr. Smith after this transaction. *See id.* at 124-25 (laying foundation for video), 221 (Agent Regan's testimony), 257-62 (discussing surveillance of Little Anita's and playing video for the jury). Moreover, nothing in the record contradicts the material testimony of Mr. Smith and Mr. Jones.

Fourth, as discussed above, the district court permitted substantial cross-examination of Mr. Smith and Mr. Jones based on the Government's disclosures, including their criminal history, compensation, and incentive to cooperate with the Government. This questioning allowed Ms. Gutierrez an opportunity to undermine their credibility despite her inability to ask about their true identities. *See Mullins*, 613 F.3d at 1283 (affirming cross-examination limitation in part because the defendant "was allowed extensive cross-examination into [the witness's] cooperation agreement with the

government"); *United States v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001) (affirming cross-examination limitation in part because the defendant "was able to elicit that [the witness] had an extensive criminal history, a serious drug problem, a history of using fake names and identifications, and a record of failing to appear in court after signing promises to do so"); *Brown*, 482 F.2d at 1229 (affirming cross-examination limitation regarding witness's previous criminal activity in part because the defendant "was otherwise allowed to test the credibility of the witness at length").

Fifth, and most important, the overall strength of the Government's case rendered any error harmless. *See Dickerson v. State*, 957 N.E.2d 1055, 1059 (Ind. Ct. App. 2011) ("The State's case against Dickerson was strong, and the testimony of the confidential informant played only a part in Dickerson's convictions. The buys were audio and video recorded and officers maintained visual surveillance during the first controlled buy and arrested Dickerson immediately following the second, finding him in possession of the buy money and other drugs."). In addition to the substantial surveillance evidence discussed above, the Government introduced Ms. Gutierrez's post-arrest confession. When Agent Wardle asked Ms. Gutierrez "about the events that gave rise to the charge in the Indictment," she "admitted that she had arranged for the alien that day at the Little Anita's to be transported to Denver." ROA, Vol. IV at 298.

In light of the corroborating evidence provided by the Government, the extent of cross-examination permitted, and the overall strength of the Government's case, which included Ms. Gutierrez's admission of guilt, we conclude the Government met its burden

-46-

to prove the error harmless beyond a reasonable doubt. *See United States v. Toles*, 297 F.3d 959, 968 (10th Cir. 2002) ("Given Toles' and Morris' confessions, as well as the corroborating evidence of the other testifying witnesses, this court is satisfied that the limitation on the cross-examination of Harris was harmless beyond a reasonable doubt.").

*       *       *

We affirm on this issue because, although the Government's showing of threat was inadequate, the Government's disclosures gave Ms. Gutierrez an opportunity for effective cross-examination, and any error was harmless beyond a reasonable doubt.

## III. CONCLUSION

In sum, we affirm Ms. Gutierrez's conviction because: (1) Agent Knoll's fact testimony did not violate the Federal Rules of Evidence or the Confrontation Clause; (2) his expert testimony on alien smuggling was helpful to the jury under Rule 702(a); and (3) the district court's error in permitting the Government's confidential informants to testify anonymously without a sufficient showing of threat did not deprive her of an opportunity for effective cross-examination and was harmless beyond a reasonable doubt.