**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 18, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GERMAINE COULTER, SR., a/k/a Slim,

    Defendant - Appellant.

No. 21-6118

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CR-00156-D-1)**

_____

Bill Zuhdi, The Zuhdi Law Firm, Oklahoma City, OK, for Defendant-Appellant.

Tiffany Noble, Assistant United States Attorney (Robert J. Troester, United States Attorney, with her on the brief), Oklahoma City, OK, for Plaintiff-Appellee.

_____

Before **MATHESON**, **CARSON**, and **ROSSMAN**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Defendant-Appellant Germaine Coulter, Sr., appeals his convictions for child sex trafficking and conspiracy to commit child sex trafficking. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*[1]

For many years, Mr. Coulter was a pimp in the Oklahoma City area.  Upon release from a five-year state prison term in 2017, he conscripted an underage girl, "Doe 2," to recruit a schoolmate, "Doe 1," to perform sex work for him.  He gave Doe 1 a ride home from school, proposed that she work for him, and promised her money and gifts in return.  After Doe 1 expressed interest, Elizabeth Andrade, one of Mr. Coulter's longtime sex workers, took pictures of Doe 1 in various stages of undress and sent them to Mr. Coulter.  He forwarded the photos to potential clients with messages suggesting that Doe 1 would perform sex acts for money.  Ms. Andrade also sent the photos to potential clients and used one of the photos to advertise Doe 1's services online.

Doe 1 had sexual encounters with clients for money.  Mr. Coulter gave her detailed instructions about how much she should charge and when to collect the money.  He also told Ms. Andrade to teach Doe 1 how to perform various sex acts.  Ms. Andrade took Doe 1 on a "call" with her, and both of them had sex with the client.

Around the same time, Mr. Coulter attempted to recruit another underage girl, "Doe 3."  He gave Doe 3 a ride home from school and asked whether she wanted to

---

[1] This factual summary derives from the evidence presented at trial, stated in the light most favorable to the jury's verdict.  *See United States v. Kaspereit*, 994 F.3d 1202, 1207 (10th Cir. 2021).

earn money by "prostitut[ing] [her]self with the other girls." ROA, Vol. III at 864.

Doe 3 told Mr. Coulter she would "think about it," but she had no interest in working

for him and never did. *Id*. at 867.

## B. *Procedural History*

A grand jury indicted Mr. Coulter and later issued a superseding indictment

charging him with (1) conspiring with Ms. Andrade to commit child sex trafficking,

(2) child sex trafficking with respect to Doe 1, and (3) child sex trafficking with

respect to Doe 3. The grand jury also indicted Ms. Andrade for conspiracy to commit

child sex trafficking. She pled guilty.

The case against Mr. Coulter proceeded to a jury trial. The Government

introduced testimony from (1) law enforcement agents who investigated Mr. Coulter;

(2) Ms. Andrade and other women who had worked for Mr. Coulter; (3) Does 1, 2,

and 3; and (4) the client who had the sexual encounter with Ms. Andrade and Doe 1.

The Government also introduced into evidence Mr. Coulter's cell phone records,

which corroborated these witnesses' testimony.

We note three occurrences during trial that are relevant to this appeal. First,

the Government elicited testimony from two witnesses about the deaths of two

women associated with Mr. Coulter—Elizabeth Diaz and Jamie Biggers. Defense

counsel objected to some questions about Ms. Diaz's death, arguing they implied that

Mr. Coulter was responsible.[2] The district court sustained the objection and forbade

---

[2] For example, Ms. Andrade testified on direct examination that Ms. Diaz died after being "given a hotshot"—a cocktail of drugs designed to induce an overdose.

3

the Government from "rais[ing] an inference that [Mr. Coulter is] responsible for th[e] girl's death." ROA, Vol. III at 427. During closing arguments, the Government briefly mentioned Ms. Diaz, but did not suggest that Mr. Coulter had killed her.

Second, the district court appointed a guardian *ad litem* for each of the minors involved in the case. At one point during Doe 1's testimony, defense counsel requested a bench conference and asserted that Doe 1's guardian *ad litem* had mouthed "[y]ou're doing a good job" to Doe 1 while she was on the stand. ROA, Vol. III at 690. The district court had not observed this conduct, but at defense counsel's request, the court told the guardian *ad litem* to avoid signaling Doe 1 during her testimony. The court also delivered a curative instruction to the jury.

Third, the jury deliberated for about six hours before reporting it had reached a verdict. It filled out verdict forms finding Mr. Coulter guilty on Counts 1 and 2—the conspiracy charge and the child sex trafficking charge related to Doe 1—but said it was deadlocked on Count 3—the child sex trafficking charge related to Doe 3. When the district court polled the jury, one juror, Ms. Noland, said the verdict did not reflect her opinion and expressed that she did not want to return to the deliberations.

---

ROA, Vol. III at 425. The Government asked Ms. Andrade, "[W]ho gave her a hotshot?" *Id*. at 425. Mr. Coulter objected on relevance grounds. *Id*. at 425-26. During a bench conference, the Government said it expected Ms. Andrade to testify that "Mr. Coulter was responsible for Ms. Diaz being given a hotshot." *Id*. at 427.

The district court recessed for the weekend.  On Monday morning, Mr. Coulter moved for a mistrial based on these events with the jury.  The district court denied the motion.

The judge then spoke with Ms. Noland in chambers.  She said that she was willing to continue deliberating.  The court next convened the jury and delivered an *Allen* instruction encouraging the jury to try to reach unanimity.[3]  After several more hours of deliberation, the jury again returned a guilty verdict on Counts 1 and 2 but reported it could not reach agreement on Count 3.[4]  All jurors confirmed their assent to the published verdict.

Mr. Coulter later moved for a new trial under Federal Rule of Criminal Procedure 33(a), asserting that (1) the evidence against him was insufficient to support the jury verdict and (2) the district court erred in admitting testimony about

---

[3] An *Allen* instruction is a "supplemental instruction given to a divided jury to encourage it to agree on a verdict."  *United States v. Cornelius*, 696 F.3d 1307, 1313 n.1 (10th Cir. 2012) (quotations omitted).  It is thus distinct from the standard instruction a court delivers at the close of evidence informing the jury how to deliberate and encouraging it to try to reach a unanimous verdict.  *United States v. Arrowgarp*, 253 F. App'x 790, 795 (10th Cir. 2007) (unpublished) ("an explanation of the duty to deliberate and the unanim[ity] requirement" delivered with other jury instructions is "not a typical *Allen* charge" (quotations omitted)).

Although not precedential, we find the reasoning of the unpublished cases cited in this opinion instructive.  *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[4] The district court therefore declared a mistrial as to Count 3 and dismissed that count.

5

the deaths of Ms. Diaz and Ms. Biggers. The court denied the motion. It sentenced Mr. Coulter to 360 months in prison. This appeal followed.

We set out additional facts and procedural history as needed in reviewing the issues Mr. Coulter raises.

## II. **DISCUSSION**

On appeal, Mr. Coulter argues:

A. The evidence was insufficient to support the guilty verdict;

B. The district court improperly admitted testimony about the deaths of Ms. Diaz and Ms. Biggers;

C. The behavior by Doe 1's guardian *ad litem* was improper bolstering;

D. The district court erred in its post-trial interactions with the jury; and

E. The convictions should be reversed based on cumulative error.[5]

As discussed below, Mr. Coulter failed to raise a contemporaneous objection to preserve several of these issues. When a party fails to preserve an issue, we review only for plain error. *United States v. Mullins*, 613 F.3d 1273, 1283 (10th Cir. 2010). "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). We provide a brief overview of plain error here.

Under plain error review, the appellant bears the burden to "show the district court committed (1) error (2) that is clear or obvious under current law, and which

---

[5] Mr. Coulter lists seven issues in his brief, Aplt. Br. at 2, but after eliminating duplication, we identify the five issues presented above.

both (3) affected [his] substantial rights and (4) undermined the fairness, integrity, or public reputation of judicial proceedings." *Mullins*, 613 F.3d at 1283.

"In general, for an error to be [clear or obvious and] contrary to well-settled law"—the second prong of plain error—"either the Supreme Court or this court must have addressed the issue." *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012) (quotations omitted).

To establish that an error affects a defendant's "substantial rights"—the third prong—the appellant must show "there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc) (quotations omitted). An appellant facing "overwhelming evidence of his guilt" usually "cannot establish a reasonable probability" that an alleged error "affected the outcome of the trial." *See United States v. Ibarra-Diaz*, 805 F.3d 908, 926 (10th Cir. 2015).

Finally, the fourth prong of plain error review—whether an error "seriously affects the fairness, integrity or public reputation of judicial proceedings"—is a "case-specific and fact-intensive" inquiry. *Bustamante-Conchas*, 750 F.3d at 1141 (quotations omitted). Generally, "the seriousness of the error must be examined in the context of the case as a whole," and the error must be "the kind [] that undermines the fairness of the judicial process." *Id*. at 1141-42 (quotations omitted).

A. *Sufficiency of the Evidence*

Mr. Coulter argues that the evidence was insufficient to support his convictions. In particular, he contends that Ms. Andrade and Doe 1 were not credible witnesses. Aplt. Br. at 38-39. We reject his argument and affirm.

1. **Standard of Review**

"We review [an] insufficiency-of-the-evidence claim *de novo*." *United States v. Benford*, 875 F.3d 1007, 1014 (10th Cir. 2017) (quotations omitted). "Evidence is sufficient to support a conviction if, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id*. "In reviewing the evidence, we do not weigh conflicting evidence or consider witness credibility, as these duties are delegated exclusively to the jury." *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003).

2. **Analysis**

The Government presented more than sufficient evidence to support Mr. Coulter's two convictions.

a. *Child sex trafficking*

To convict Mr. Coulter of child sex trafficking, the jury had to find that Mr. Coulter:

    (1) "by means affecting interstate commerce,

    (2) knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained [a minor] or benefitted in a venture which involved [a minor], and

(3) knew or recklessly disregarded the fact that [the minor] was younger than 18, and

(4) knew or recklessly disregarded the fact that [the minor] would engage in a commercial sex act."

*United States v. Brinson*, 772 F.3d 1314, 1325 (10th Cir. 2014) (numbers added) (citing 18 U.S.C. § 1591(a)).

Elements (1), (2), and (4) - In addition to the testimony of Doe 1 and Ms. Andrade about the recruitment and preparation of Doe 1 for sex work, the Government introduced Mr. Coulter's phone records, which contained (1) explicit pictures of Doe 1, (2) text messages soliciting clients for Doe 1, and (3) instructions directing Doe 1 to take money from clients in exchange for sex.  Suppl. ROA, Vol. II at 16, 19-21 [Redacted]; ROA, Vol. III at 453-56.  The Government also presented a client who had a sexual encounter with Doe 1 and Ms. Andrade in exchange for money.  ROA, Vol. III at 731-32.  This evidence was sufficient to establish that Mr. Coulter used means affecting interstate commerce to knowingly recruit Doe 1 to perform commercial sexual transactions and facilitated those transactions.  A reasonable jury could find elements (1), (2), and (4) of child sex trafficking beyond a reasonable doubt.

Element (3) - According to both Ms. Andrade and Doe 1, Mr. Coulter first suggested that Doe 1 perform sex work for him while driving her home from high school.  ROA, Vol. III at 443.  Ms. Andrade also testified that she told Mr. Coulter that Doe 1 was a minor.  *Id*. at 456.  And Doe 1 testified that Mr. Coulter promised her "a place to stay when she's old enough."  *Id*. at 446.  A reasonable jury could find

9

beyond a reasonable doubt that Mr. Coulter knew or recklessly disregarded the fact that Doe 1 was a minor—element (3) of child sex trafficking.

      b.  *Conspiring to commit child sex trafficking*

To convict Mr. Coulter on the conspiracy count, the jury had to find:

> (1) "that 'two or more persons agreed to violate' the child-sex-trafficking laws;
>
> (2)  that [Mr. Coulter] 'knew at least the essential objectives of the conspiracy';
>
> (3) that he 'knowingly and voluntarily became part of it'; and
>
> (4) that the 'alleged coconspirators were interdependent.'"

*United States v. Anthony*, 942 F.3d 955, 971 (10th Cir. 2019) (numbers added) (quoting *United States v. Serrato*, 742 F.3d 461, 467 (10th Cir. 2014)).

In addition to the evidence discussed above, Ms. Andrade testified that she and Mr. Coulter worked together to recruit Doe 1 and that they both facilitated her participation in commercial sex transactions. For example, Ms. Andrade took explicit pictures of Doe 1, and Mr. Coulter used those pictures to entice potential clients. ROA, Vol. III at 608-09. The evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that (1) Mr. Coulter and Ms. Andrade agreed to violate the child sex-trafficking laws, (2) Mr. Coulter knew the objective of the conspiracy with Ms. Andrade was to traffic Doe 1, (3) he knowingly and voluntarily participated in the conspiracy, and (4) he worked interdependently with Ms. Andrade to implement their agreement.

c. *Mr. Coulter's arguments against sufficiency*

Mr. Coulter's arguments are unavailing. He focuses primarily on the credibility of Ms. Andrade and Doe 1. But on review of the sufficiency of the evidence, we do not "consider witness credibility," a task "delegated exclusively to the jury." *Evans*, 318 F.3d at 1018. And as discussed above, the Government corroborated both witnesses' testimony with ample supporting evidence.

Mr. Coulter also claims he "had nothing to do with [a] sexual transaction between [a client] and Doe 2." Aplt. Br. at 39. But his convictions stem from his conduct toward Doe 1, not Doe 2. He also disputes a law enforcement officer's testimony that Mr. Coulter was a member of the "Crip" gang. Aplt. Br. at 40. This testimony was not relevant to the child sex trafficking offense.

### B. *Testimony about the Deaths of Ms. Diaz and Ms. Biggers*

Mr. Coulter contends that the admission of testimony about the deaths of Ms. Diaz and Ms. Biggers violated the Sixth Amendment's Confrontation Clause, Aplt. Br. at 16, or constituted inadmissible hearsay, *id*. at 33-34. He also suggests the Government engaged in prosecutorial misconduct by eliciting this testimony and referencing Ms. Diaz's death in its closing argument. *Id*. at 28.

1. **The Challenged Testimony and Closing Argument**

Two witnesses testified about the deaths of Ms. Diaz and Ms. Biggers: Megan Mullins, who formerly worked for Mr. Coulter, and Ms. Andrade, his alleged co-conspirator.

a. *Ms. Mullins's testimony*

During the direct examination of Ms. Mullins, the Government asked about how Mr. Coulter disciplined women when they disobeyed him. In response, Ms. Mullins said that when "Lizzy"—Elizabeth Diaz—refused to turn over her earnings, Mr. Coulter physically abused Ms. Diaz and locked her in a closet. ROA, Vol. III at 169.

On cross-examination, Mr. Coulter's attorney asked, "[H]ave you seen that girl since?" *Id*. at 200. Ms. Mullins replied, "She's dead." *Id*. Mr. Coulter's attorney asked when Ms. Diaz died. *Id*. Ms. Mullins responded, "I think 2011, 2012." *Id*.

On redirect, the Government and Ms. Mullins had the following exchange:

> Q: You mentioned that Elizabeth Diaz passed away.
>
> A: Yes.
>
> Q: What happened to her?
>
> A: I was incarcerated. From my understanding, she went on a call and she was --
>
> Defense counsel: Objection. Hearsay.
>
> District court: Overruled. You opened the door to this . . . so I'm going to let her follow up. Go ahead.
>
> A: She was found fully clothed like ten days later. They said it was a drug overdose.
>
> Q: All right. What do you believe happened to her?
>
> Defense counsel: Objection. Speculation.
>
> District court: Overruled. I'll listen to the answer first.
>
> A: I mean, she was killed.
>
> Q: Do you know who killed her?

12

A: I don't know.

Q: Do you have someone in mind that you believe was responsible?

A: I don't know.

. . .

Q: What did Mr. Coulter say about Ms. Diaz dying?

. . .

A: We shouldn't let bad things happen to daddy.[6]

ROA, Vol. III at 204-06.

Later in the redirect examination of Ms. Mullins, while discussing other women who were associated with Mr. Coulter, the Government asked about Jamie Biggers. Ms. Mullins said that Ms. Biggers had "passed away." *Id*. at 210. When the Government asked how this occurred, Ms. Mullins stated that Ms. Biggers "got pushed out of a car on the highway and got hit head on." *Id*. at 210. The Government asked, "Who pushed her?" *Id*. Ms. Mullins responded, "I don't know." *Id*. Defense counsel did not object to the questions regarding Ms. Biggers's death. *Id*.

b. *Ms. Andrade's testimony*

During direct examination, the Government asked Ms. Andrade about several women associated with Mr. Coulter, including Ms. Diaz and Ms. Biggers. Ms. Andrade said Ms. Diaz "passed away" because "[s]he was given a hotshot," ROA, Vol. III at 425, a cocktail of drugs designed to induce an overdose. *Id*. at 427.

---

[6] "[D]addy" is a reference to Mr. Coulter.

The Government asked, "[W]ho gave [Ms. Diaz] a hotshot?" *Id*. at 425-26. Defense counsel objected on relevance grounds. *Id*. The district court sustained the objection and forbade the Government from eliciting any testimony that "might raise an inference that [Mr. Coulter is] responsible for this girl's death." *Id*. at 427. Ms. Andrade also testified that Ms. Biggers had "passed away," but Mr. Coulter did not object to that testimony. *Id*. at 425.

c. *The Government's closing argument*

During the closing argument, the prosecutor briefly referenced Ms. Diaz's death, saying "Lizzie Diaz died while [Mr. Coulter] was in jail, and Mr. Coulter told Ms. Mullins, according to her, 'We shouldn't let bad things happen to daddy.'" ROA, Vol. III at 928. Mr. Coulter did not object to this statement. *Id*. at 928-29.

2. **Analysis**

a. *Confrontation Clause*

Mr. Coulter contends that the testimony from Ms. Mullins and Ms. Andrade about Ms. Diaz's and Ms. Biggers's deaths violated the Confrontation Clause. Aplt. Br. at 16. Mr. Coulter has waived this argument.

i. Standard of review and waiver

"[W]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte* . . . ." *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc);

14

*see also Ibarra-Diaz*, 805 F.3d at 919-20 (applying plain error review to an unpreserved Confrontation Clause argument).

When a defendant fails to preserve a Confrontation Clause challenge in the district court and also fails to "argue for the plain error standard in his opening brief," he has generally waived the issue. *United States v. MacKay*, 715 F.3d 807, 834 (10th Cir. 2013); *see also United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise."). We have exercised our discretion to consider plain error arguments raised for the first time in an appellant's reply brief, but seldom do so if (1) the appellant clearly forfeited the issue below and (2) the appellant's failure to argue for plain error review in the opening brief appears to be intentional. *Leffler*, 942 F.3d at 1198.

          ii.  Application

Mr. Coulter did not make a Confrontation Clause objection in district court. Instead, he objected to Ms. Mullins's testimony on hearsay and speculation grounds and to Ms. Andrade's testimony on relevance grounds. *See* ROA, Vol. III at 204-06; 425-26. Because "a Confrontation Clause objection [was] not explicitly made below," we review for plain error. *Perez*, 989 F.2d at 1582.

Mr. Coulter makes no plain error arguments in his opening brief. He instead asserts that we should review his Confrontation Clause claim de novo. Aplt. Br.

at 15.  In his reply brief, Mr. Coulter states that "reviewing the testimony . . . under the plain error standard" entitles him to relief, Aplt. Reply Br. at 8, but he does not address the elements of plain error.  Because Mr. Coulter fails to argue for plain error in his opening brief or discuss the elements of the standard in his reply brief, he has waived the issue.  *MacKay*, 715 F.3d at 834.[7]

b. *Hearsay*

Mr. Coulter argues that the testimony about Ms. Diaz's and Ms. Biggers's deaths was inadmissible hearsay.  Aplt. Br. at 33-36.  Mr. Coulter preserved only one hearsay argument:  the overruling of his objection to the Government's redirect examination of Ms. Mullins about the manner of Ms. Diaz's death.  ROA, Vol. III at 204-06.

i.  Waiver

Mr. Coulter forfeited any hearsay challenge to the remaining portions of Ms. Mullins's and Ms. Andrade's testimony about Ms. Diaz's and Ms. Biggers's deaths.  Mr. Coulter objected to Ms. Andrade's testimony on relevance, not hearsay grounds.  ROA, Vol. III at 425-26.  The district court also sustained his objection and prevented the testimony from continuing.  *Id*.  Mr. Coulter failed to object to Ms.

---

[7] The argument also fails on the merits because Mr. Coulter concedes in his reply brief that he "never claimed the hearsay testimony regarding the killing/deaths of Ms. Diaz and Ms. Biggers were testimonial statements."  Aplt. Reply Br. at 6.  The Confrontation Clause applies only to "testimonial" statements by out-of-court declarants.  *Michigan v. Bryant*, 562 U.S. 344, 354 (2011); *see also Hemphill v. New York*, 142 S. Ct. 681, 690 (2022).

Mullins's and Ms. Andrade's testimony about Ms. Biggers's death.  ROA, Vol. III at 210, 425.

On appeal, Mr. Coulter fails to argue plain error in his opening brief. *See* Aplt. Br. at 35-36.  In his reply brief, he asserts that "[e]ven reviewing the testimony about Ms. Bigger's [sic] death . . . under the plain error standard," he is entitled to relief.  Aplt. Reply Br. at 8.  But he still fails to show how he has satisfied the four elements of plain error review.  *See id*. at 8-9.  Thus, he waived the issue. *Leffler*, 942 F.3d at 1198.  This leaves only Mr. Coulter's hearsay challenge to Ms. Mullins's testimony on redirect about the manner of Ms. Diaz's death.

### ii.  Ms. Mullins's testimony about Ms. Diaz

#### 1)  Standard of review

"We review the district court's evidentiary rulings"—including decisions about hearsay—"for an abuse of discretion, considering the record as a whole." *United States v. Lovato*, 950 F.3d 1337, 1341 (10th Cir. 2020) (quotations omitted).

"Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a); *see United States v. Jones*, 818 F.3d 1091, 1101 (10th Cir. 2016).  Under this standard, "[a]n error is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect."  *Jones*, 818 F.3d at 1101 (quotations omitted).

"We 'review[] the record as a whole de novo to evaluate whether the error [was] harmless, examining the context, timing, and use of the erroneously admitted evidence at trial and how it compares to properly admitted evidence.'"  *United States*

17

*v. Blechman*, 657 F.3d 1052, 1067 (10th Cir. 2011) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1237 (10th Cir. 1999)).  "A nonconstitutional error is reversible unless the Government can prove harmlessness by a preponderance of the evidence."  *Jones*, 818 F.3d at 1101.

### 2)  Legal background

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  "If, however, the witness merely has personal knowledge of an out-of-court statement offered to prove the fact asserted in that statement—but not the underlying fact—then his or her testimony must comply with the hearsay rule." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014).

"'Hearsay' means a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is generally inadmissible.  Fed. R. Evid. 802.

### 3)  Application

Ms. Mullins's testimony about Ms. Diaz's death was hearsay.  First, there was no "evidence [] sufficient to support a finding that" she "ha[d] personal knowledge of" Ms. Diaz's death.  *Gutierrez de Lopez*, 761 F.3d at 1132 (citation omitted).[8]

---

[8] In his brief, Mr. Coulter mostly refers to the testimony about Ms. Diaz's death as "hearsay," but occasionally refers to it as "speculation."  *See, e.g.*, Aplt. Br. at 16.  Ms. Mullins's testimony about Ms. Diaz's death was hearsay rather than speculation because it was based on out-of-court statements rather than mere

Instead, Ms. Mullins "merely ha[d] personal knowledge of [] out-of-court statement[s]" about Ms. Diaz's death. *Id*. Second, in context, the Government elicited this testimony to "prove the fact of the matter asserted in th[e] statement[s]"—namely, that Ms. Diaz had died due to a drug overdose. *Id*. Her testimony was therefore hearsay. *See id*.

The district court overruled Mr. Coulter's hearsay objection, concluding that defense counsel "opened the door" on cross-examination of Ms. Mullins to rebuttal testimony about the manner of Ms. Diaz's death. ROA, Vol. III at 204-06. Mr. Coulter disagrees. Aplt. Br. at 16. On appeal, the Government argues that Mr. Coulter opened the door, but that even if he did not, any error was harmless. *See* Aplee. Br. at 18-19; *id*. at 37-38.

We agree with the Government that it can prove by a preponderance that any hearsay error was harmless. We thus need not decide whether Mr. Coulter's counsel opened the door to testimony about Ms. Diaz's death. Based on the overwhelming evidence of Mr. Coulter's guilt, we are not "in grave doubt as to whether" any such error "ha[d] a substantial influence on the outcome of the trial." *Blechman*, 657 F.3d at 1067 (quotations omitted). We make that determination in light of "the record as a whole," considering "the context, timing, and use of the erroneously admitted evidence." *Id*. (quotations omitted). The testimony from Doe 1, Ms. Andrade, the

---

guesswork: she testified that "[t]hey said" Ms. Diaz died of "a drug overdose." ROA, Vol. III at 204-06. *See Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1208 (10th Cir. 2021).

former client, and other witnesses, as well as the cell phone records, showed that Mr. Coulter solicited clients for Doe 1 and instructed her on how to perform commercial sex transactions. No part of the Government's case depended on Ms. Diaz's death.

In light of this evidence, any prejudice resulting from Ms. Mullins's and Ms. Andrade's references to Ms. Diaz's death was comparatively insignificant. Ms. Mullins's discussion of Ms. Diaz was a small fraction of her testimony. Moreover, when the Government attempted to connect Ms. Diaz's death to Mr. Coulter during Ms. Andrade's testimony later in the trial, the district court prevented the Government from eliciting testimony that Mr. Coulter was involved. ROA, Vol. III at 427. Indeed, Ms. Mullins testified that Mr. Coulter was in jail at the time of Ms. Diaz's death. ROA, Vol. III at 204-06. When the Government referenced Ms. Diaz's death in its closing argument, it stated that "Lizzie Diaz died while [Mr. Coulter] was in jail," ROA, Vol. III at 928, weakening any inference that Mr. Coulter was involved in her death. Given the "context, timing, and use" of the evidence about Ms. Diaz's death, any erroneous admission of the evidence did not have "a substantial influence on the outcome of the trial." *Blechman*, 657 F.3d at 1067 (quotations omitted).

c. *Prosecutorial misconduct*

Mr. Coulter argues the prosecution engaged in misconduct by asking about Ms. Diaz's and Ms. Biggers's deaths and referencing Ms. Diaz's death in closing argument. Aplt. Br. at 24. We disagree.

20

i. Standard of review

Mr. Coulter did not raise a contemporaneous prosecutorial misconduct objection when the Government asked about Ms. Diaz's and Ms. Biggers's deaths, ROA, Vol. III at 204-06, 210, 425-26, nor when it mentioned Ms. Diaz's death in closing argument, ROA, Vol. III at 928, so we "review the district court's failure to grant a mistrial *sua sponte* based on prosecutorial misconduct for plain error." *United States v. Anaya*, 727 F.3d 1043, 1059 (10th Cir. 2013).

ii. Legal background

A prosecutor may commit misconduct by eliciting improper and prejudicial witness testimony. *See, e.g.*, *United States v. Green*, 435 F.3d 1265, 1268-69 (10th Cir. 2006). A prosecutor's questions to witnesses are not improper if the questions elicit testimony for a "permissible purpose." *United States v. Shamo*, 36 F.4th 1067, 1080 (10th Cir. 2022); *see also United States v. Lonedog*, 929 F.2d 568, 573 (10th Cir. 1991).

A prosecutor may also commit misconduct by making improper comments during closing argument. *United States v. Christy*, 916 F.3d 814, 824-25 (10th Cir. 2019). In assessing a misconduct claim on this ground, "(1) the court first decides whether the prosecutor's comments were improper, and (2) if so, it examines their likely effect on the jury's verdict." *Id*. at 824. A prosecutor's comments are generally improper if they distort the record or encourage the jury to base its decision on irrelevant considerations. *Id*. at 824-25 (summarizing categories of improper statements).

21

If a prosecutor acted improperly, we must then assess "whether the c[onduct] affected the jury's verdict" in light of "the trial as a whole." *Id*. at 826 (citations omitted).

           iii. Application

Mr. Coulter asserts he has shown plain error stemming from (1) the Government's questions about the deaths of Ms. Diaz and Ms. Biggers and (2) the prosecution's reference to Ms. Diaz's death during its closing argument. Aplt. Br. at 32. His arguments are lacking.

Mr. Coulter has not shown that the Government acted improperly in questioning Ms. Mullins and Ms. Andrade about the deaths of Ms. Diaz and Ms. Biggers. The Government argues it asked Ms. Mullins and Ms. Andrade about Ms. Diaz's death to "provide[] context to the dynamic of the relationship between Coulter and the victims he employed." Aplee. Br. at 35. It contends that Mr. Coulter used Ms. Diaz's death to "intimidate[] his victims" by implying that "had [Ms. Diaz] protected Coulter from going to prison, he might have been able to protect Ms. Diaz and prevent her death." *Id*. As for Ms. Biggers, the Government argues that testimony about her death provided additional context about Mr. Coulter's relationship with the women who worked for him, and points out that none of its questions about Ms. Biggers suggested that Mr. Coulter was involved in her death. *Id*. at 28-29. We find these points persuasive, and Mr. Coulter does not refute them. He thus has not shown that the Government elicited this testimony for an impermissible purpose. *Shamo*, 36 F.4th at 1080.

22

Similarly, Mr. Coulter has not shown that the prosecutor's closing argument comments about Ms. Diaz were improper. *Christy*, 916 F.3d at 824-25. The Government explains that in quoting Mr. Coulter as saying "[w]e shouldn't let bad things happen to Daddy," ROA, Vol. III at 928, it "illustrate[d] his callous treatment of the women who worked for him," Aplee. Br. at 35. The Government's use of Mr. Coulter's statement neither distorted the record nor encouraged the jury to base its decision on irrelevant considerations. *Christy*, 916 F.3d at 824-25.

And even if the Government acted improperly in examining Ms. Mullins and Ms. Andrade or referencing Ms. Diaz's death in closing argument, Mr. Coulter fails at the second and third prongs of plain error review. He has not demonstrated that the alleged error was "clear or obvious under current law," *Mullins*, 613 F.3d at 1283 (quotations omitted), by citing Tenth Circuit or Supreme Court precedent. *DeChristopher*, 695 F.3d at 1091. And he has not shown "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different," *Bustamante-Conchas*, 850 F.3d at 1138 (quotations omitted), given the "overwhelming evidence of his guilt," *Ibarra-Diaz*, 805 F.3d at 926. Any prejudice here was minimal because the evidence did not suggest that Mr. Coulter was involved in the deaths. Ms. Mullins testified that Mr. Coulter was in prison when Ms. Diaz died, ROA, Vol. III at 205-06, and Ms. Andrade said nothing to indicate that Mr. Coulter was responsible for Ms. Biggers's death.

## C. *Doe 1's Guardian* Ad Litem

Mr. Coulter argues that the guardian *ad litem*'s mouthing "you're doing a good job" to Doe 1 during her testimony constituted improper bolstering in violation of his "Sixth Amendment rights to an impartial jury" and his right to a fair trial. Aplt. Br. at 47. We disagree.

### 1. Standard of Review

Mr. Coulter objected to the guardian *ad litem*'s conduct when it occurred. ROA, Vol. III at 690. The district court sustained the objection and delivered a curative jury instruction. *Id*. at 697-89. Because Mr. Coulter "fail[ed] to object to the adequacy of the curative action or ask for a mistrial, we review for plain error." *United States v. Anaya*, 727 F.3d 1043, 1052 (10th Cir. 2013).[9]

### 2. Legal Background

"'Vouching,' or 'an assurance by the prosecuting attorney of the credibility of a government witness through personal knowledge or by other information outside of the testimony before the jury,' amounts to improper prosecutorial conduct." *Littlejohn v. Trammell*, 704 F.3d 817, 837 (10th Cir. 2013) (quoting *Lam v. Kelchner*, 304 F.3d 256, 271 (3d Cir. 2002)). This improper conduct "can result in constitutional error" in two ways: (1) "prejudice a specific right . . . [so] as to

---

[9] Both Mr. Coulter and the Government agree that plain error review applies despite Mr. Coulter's contemporaneous objection to the guardian *ad litem*'s conduct. Aplt. Br. at 47; Aplee. Br. at 59.

amount to a denial of that right" or (2) "render a [defendant's] trial so fundamentally unfair as to deny him due process." *Littlejohn*, 704 F.3d at 837 (quotations omitted).

A statement about a witness's credibility is improper bolstering only if the prosecutor "explicitly or implicitly guarantee[s] that the witness['s] statements were true." *United States v. Brooks*, 736 F.3d 921, 935 (10th Cir. 2013). We have applied the prohibition on bolstering to statements by prosecutors and individuals affiliated with the prosecution. For example, in *Brooks*, we considered whether a law enforcement officer improperly bolstered cooperating witnesses by testifying "about how [they] conferred with the government on the scope and substance of their testimony." *Id*. at 934.

But we have never applied the doctrine to statements by third parties unaffiliated with the prosecution. Instead, when a defendant claims a third party acted inappropriately at trial, we typically assess whether the third party's behavior violated the defendant's Fifth Amendment right to due process. In *United States v. Dixon*, for example, a witness mouthed "I am sorry" to the defendant after giving testimony against him. 268 F. App'x 767, 770 (10th Cir. 2008) (unpublished). The defendant argued that this violated due process because it unfairly reinforced the witness's credibility. *Id*. We disagreed, holding that "[e]ven if the jury may have viewed [the witness's] apology as enhancing her credibility to some degree, it certainly did not bolster it so much as to warrant a new trial." *Id*.; *see also United States v. Encinias*, 123 F. App'x 924, 942 (10th Cir. 2005) (unpublished) (rejecting a defendant's due process claim based on a victim's mother's outburst).

25

When the district court issues a curative instruction, "we presume the jury followed the instruction." *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1175 (10th Cir. 2003).

3. **Application**

We discern no error, let alone plain error. We have never held that a statement by a third party unaffiliated with the prosecution can constitute improper bolstering. Mr. Coulter presents no argument or authority suggesting that a guardian *ad litem* or a similarly situated third party may commit improper bolstering. *See Littlejohn*, 704 F.3d at 837 (bolstering is "an assurance by the prosecuting attorney of the credibility of a government witness" (quotations omitted)).

Even if the bolstering doctrine applies to third parties, the guardian *ad litem*'s conduct was not improper bolstering, which occurs only with "explicit[] or implicit[] guarantee[s] that the witness['s] statements were true." *Brooks*, 736 F.3d at 935. In context, the guardian *ad litem*'s "doing a good job" message was an attempt to reassure Doe 1 rather than a guarantee that Doe 1 was telling the truth. *See State v. Smith*, 780 N.E.2d 221, 232 (Ohio 2002) (a prosecutor did not bolster a witness by "telling her she was doing a good job," because he "was simply reassuring [the witness] in the midst of her difficult testimony"). The guardian *ad litem*'s conduct thus did not violate Mr. Coulter's Sixth Amendment rights.

Although some of our cases have discussed due process challenges based on a third party's inappropriate or distracting conduct during a trial, *see Dixon*, 268 F. App'x at 770; *Encinias*, 123 F. App'x at 942, Mr. Coulter does not cite these

26

cases, nor does he use the phrase "due process" in connection with the guardian *ad litem*. *See* Aplt. Br. at 46-48. Thus, although Mr. Coulter claims that "the [guardian *ad litem*'s] actions . . . caused his trial to be fundamentally unfair," Aplt. Br. at 47, he does not develop a due process fairness argument.

But even if he had, the guardian *ad litem*'s conduct did not render Mr. Coulter's trial unfair. It appears that Mr. Coulter's attorney was the only person who saw the alleged interaction between the guardian *ad litem* and Doe 1. ROA, Vol. III at 690. If any jurors saw the interaction, it is unlikely that it affected the outcome of the trial. As we held in *Dixon*, "[e]ven if the jury may have viewed" the guardian's conduct "as enhancing [Doe 1']s credibility to some degree, it certainly did not bolster it so much as to warrant a new trial." 268 F. App'x at 770.

Finally, the district court delivered a curative instruction telling the jury to disregard any communication between the guardian *ad litem* and Doe 1. We "presume the jury followed th[at] instruction," *Abuan*, 353 F.3d at 1175, and Mr. Coulter has presented nothing to suggest otherwise.

### D. *The District Court's Interactions with the Jury*

Mr. Coulter challenges the district court's post-trial interactions with the jury on various grounds. Because we find the court did not abuse its discretion, we affirm.

1. **Additional Procedural History**

After the parties' closing arguments, the district court delivered the jury instructions, which included a standard instruction encouraging the jury to try to achieve unanimity.

The jury retired to deliberate at 12:36 p.m. on Friday, July 19.  At 5:21 p.m., the district court received the following written question from the jury:  "[W]hat do we do if we are unable to vote a unanimous verdict for Count 3?"  ROA, Vol. III at 973.  The district court responded in writing that the jury should review the instruction on how to deliberate, and that "[i]f you cannot reach a unanimous verdict on any particular count and believe you are hopelessly deadlocked, you may return a partial verdict on other counts on which you unanimously agree."  *Id*. at 973-74.

At 6:45 p.m., the jury signaled it had reached a verdict.  The foreperson said that the jury could not reach agreement on Count 3 but found Mr. Coulter guilty on Counts 1 and 2.  The district court announced the verdict on the first two counts and asked the jurors to "indicate by raising [their] hands" whether "the verdict constitute[s] [their] unanimous verdict."  *Id*. at 979.  One juror, Ms. Noland, did not raise her hand.  *Id*. When the court questioned her about whether the verdict on Counts 1 and 2 represented her vote, she responded, "No."  *Id*. at 979-80.

The district court, after consulting with both parties, told the jury, "I'm going to give you an instruction fairly quickly with respect to what we're going to do for the rest of the evening."  *Id*. at 980.  He then sent the jury back to the jury room to continue its

deliberations.  Ms. Noland, however, became "emotional" and refused to return to the jury room.  *Id*. at 982.  The court decided to send the jury home for the weekend.

On Monday morning, Mr. Coulter filed a motion for a mistrial, arguing that (1) the jury's deliberations were no longer secret and (2) the district court pressured the jury to reach a unanimous verdict when it answered the jury's written question about deadlock by directing its attention to the instruction on how to deliberate.  ROA, Vol. I at 480-82.  The court denied the motion for a mistrial and decided—over Mr. Coulter's objection—to talk with Ms. Noland outside the presence of the remaining jurors to determine whether she would be willing to continue deliberating.  ROA, Vol. III at 1000.

The district court brought Ms. Noland into chambers.  The judge assured her that she "didn't do anything wrong" and was "not in trouble."  *Id*. at 1006-07.  He also reminded her that she should not discuss "how anybody is voting in the deliberation room."  *Id*. at 1007.  Then the judge asked her whether she was "ready, willing, and able to continue to deliberate with the other jurors" and "able to follow [the court's] instructions on the law."  *Id*. at 1007-08.  Ms. Noland said she was.  *Id*.  The judge reminded her that "there is a process for the jury to communicate with me that you can't reach a unanimous agreement," and asked her to return to the courtroom.  *Id*. at 1008.  As she was leaving, Ms. Noland remarked that she "felt like [she] was at the principal's office."  *Id*.

Back in the courtroom, the district court delivered the following *Allen* instruction:

> Members of the jury, I'm going to ask that you return to the
> jury room and deliberate further.  I realize that you are having
> some difficulty reaching a unanimous agreement but that is

29

not unusual. Sometimes, after further discussions, jurors are able to work out their differences and agree. This is an important case. If you should fail to agree upon a verdict, the case is left open and must be tried again. Obviously, another trial would require the parties to make another large investment of time and effort, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you . . . . In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry. I will now ask that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given to you.

ROA, Vol. III at 1012-13. Mr. Coulter did not object to this instruction. *See id*. at 1010-11. The jury resumed deliberating at 10:34 a.m.

At 2:07 p.m., the jury again indicated that it had reached a verdict. It reported a deadlock on Count 3, but said it had reached a unanimous guilty verdict on Counts 1 and 2. The district court declared a mistrial as to Count 3, and announced the verdict on the first two counts. The court again polled the jury. All jurors, including Ms. Noland, raised their hands to manifest agreement with the published verdict. *Id*. at 1016-17.

2. **Standard of Review**

We review the district court's management and decisions about jury deliberations for abuse of discretion. This includes whether to poll the jury *sua sponte*, to declare a mistrial or direct the jury to continue to deliberate, to investigate

potential problems with jury deliberations, and to deliver an *Allen* instruction encouraging the jury to try to reach unanimity. *See United States v. Shamo*, 36 F.4th 1067, 1080 (10th Cir. 2022); *United States v. Cornelius*, 696 F.3d 1307, 1321 (10th Cir. 2012); *United States v. Zabriskie*, 415 F.3d 1139, 1147 (10th Cir. 2005).

3. **Analysis**

Mr. Coulter argues that the district court abused its discretion by placing improper pressure on the jury to reach a unanimous verdict in violation of his Sixth Amendment right to an impartial jury. Aplt. Br. at 44; *see Zabriskie*, 415 F.3d at 1148.[10] He contends that the court should instead have granted his motion for a mistrial. Aplt. Br. at 40. We disagree.

a. *Jury poll and numerical inquiry*

Federal Rule of Criminal Procedure 31(d) provides:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Mr. Coulter suggests on appeal that the district court should not have polled the jury. *See, e.g.*, Aplt. Br. at 44-45. Specifically, he contends the district court violated *Brasfield v. United States*, 272 U.S. 448 (1926), in which the Supreme Court

---

[10] We address challenges to the district court's post-trial interactions with the jury that Mr. Coulter appears to raise on appeal.

held that a trial court may not "inquire[] how [the jury] was divided numerically" during jury deliberations. *Id*. at 449.[11] The Court reasoned that such numerical inquiries exert a "coercive . . . [and] improper influence upon the jury" to reach a unanimous verdict. *Id*. at 450.

Because the jury poll revealed that only one juror did not acquiesce in the verdict, Mr. Coulter suggests that the poll was an improper "numerical inquiry" under *Brasfield*. Aplt. Br. at 44. We disagree. In *Brasfield*, after the jury said it was deadlocked, the trial court inquired about the number of votes for guilt and for acquittal. 272 U.S. at 449. Here, by contrast, the district court polled the jury only after it rendered a verdict, and the court had no reason to suspect the verdict was not unanimous. Once the poll revealed that Ms. Noland did not agree with the verdict, the court conducted no further inquiries about Ms. Noland's position or that of other jurors. As far as the district court was aware, Ms. Noland could have disagreed with the verdict as to Count 1, Count 2, or both, or could have wished to continue deliberating on Count 3. The court did not conduct a "numerical inquiry" and thus did not violate *Brasfield*.

The Supreme Court and our circuit have repeatedly rejected efforts to expand the *Brasfield* principle to standard jury polls. *See, e.g.*, *Lowenfield v. Phelps*,

---

[11] Mr. Coulter alluded to this argument in his motion for a mistrial, though he did not cite *Brasfield*. *See* ROA, Vol. I at 480-81. He argued that the jury poll revealed Ms. Noland's vote, making the jury's deliberations no longer secret and imposing pressure on her to assent to the verdict. *Id*.

484 U.S. 231, 239-40 (1988) (an *Allen* charge, combined with non-numerical jury polling, did not violate the *Brasfield* rule); *Gafford v. Warden, U.S. Penitentiary, Leavenworth, Kan.*, 434 F.2d 318, 319 (10th Cir. 1970) (declining to extend *Brasfield* to jury polls); *United States v. Alvarez-Pasillas*, 159 F. App'x 42, 45 (10th Cir. 2005) (unpublished) (district court has discretion to direct further deliberations after polling the jury); *United States v. Smith*, 562 F.2d 619, 622 (10th Cir. 1977) (same).  This precedent is consistent with Federal Rule of Criminal Procedure 31(d), which gives the district court the discretion to poll the jury and, if the poll reveals a lack of unanimity, to declare a mistrial or direct further deliberations.[12]  Mr. Coulter's argument based on *Brasfield* thus lacks merit.

The district court therefore acted within its discretion when it polled the jury. If a poll shows that the jurors are not unanimous, "Rule 31(d) vests in the trial court broad discretion whether to declare a mistrial or order the jury to resume deliberations." *Alvarez-Pasillas*, 159 F. App'x at 45.  This is because "[t]he trial judge 'is in a better position than the appellate court to determine the effect of a dissenting or uncertain vote upon the likelihood that further deliberations will yield a freely given verdict.'" *Id.* (quoting *Smith*, 562 F.2d at 622).

---

[12] *Brasfield* "makes no mention of the Due Process Clause or any other constitutional provision." *Lowenfield*, 484 U.S. at 240 n.3.  We thus have interpreted *Brasfield* as "an exercise of [the appellate court's] supervisory powers . . . not a constitutional holding." *Gilbert v. Mullin*, 302 F.3d 1166, 1176 (10th Cir. 2002) (quotations omitted).

33

Here, when the poll "reveal[ed] a lack of unanimity," the court acted within its discretion by "direct[ing] the jury to deliberate further" rather than declaring a mistrial. *Id.* The court was in "a better position" than we are "to determine the effect of" Ms. Noland's dissent on the likelihood that the jury could reach a unanimous verdict. *Smith*, 562 F.2d at 622. Mr. Coulter presents no argument that the district court acted unreasonably when it polled the jury and decided that further deliberations could be productive.

b. *Pressure on Ms. Noland from other jurors*

Mr. Coulter suggests that when the district court ordered the jury to return to deliberations after Ms. Noland revealed her dissenting vote, she may have faced pressure from the other jurors to reach a unanimous verdict. Aplt. Br. at 44 (Ms. Noland's unwillingness to return to the deliberations "indicates she was feeling undue pressure from the other jurors"). This argument is speculative. Also, when addressing arguments that a juror felt pressured to reach a verdict, we typically focus on the behavior of the trial court—not other jurors. In *Crease v. McKune*, 189 F.3d 1188 (10th Cir. 1999), for example, a juror reported that she "finally voted to convict after feeling pressure from other jurors." *Id.* at 1194. We nonetheless denied relief to the defendant because there was no evidence that the juror "felt [] pressure from the judge to vote to convict." *Id.* Mr. Coulter presents no authority suggesting that the possibility of pressure from other jurors on Ms. Noland, without more, violated his constitutional rights.

34

c. *The district court's meeting with Ms. Noland*

Mr. Coulter contends that the district court's separate meeting with Ms. Noland placed "undue coercion and pressure" on her to reach a unanimous verdict. Aplt. Br. at 43. He points to her statement that she "felt like [she] was at the principal's office." *Id*. (quoting ROA, Vol. III at 1008). We disagree.

If the district court identifies a potential problem with jury deliberations, it has "broad discretion in investigating," including "separately interviewing" jurors. *Zabriskie*, 415 F.3d at 1147. But the court must not "impose[] such pressure on the [members of the] jury such that the accuracy and integrity of their verdict becomes uncertain." *Id*. at 1148.

Here, the district court properly exercised its "broad discretion in investigating" when it "separately interview[ed]" Ms. Noland. *Zabriskie*, 415 F.3d at 1147.[13] The judge told Ms. Noland that she was "not in trouble" and cautioned her not to reveal "how anybody is voting." ROA, Vol. III at 1006-07. He asked Ms. Noland only whether she was willing to continue deliberating and follow the law. *Id*. at 1007-08. Although Ms. Noland may have felt nervous—hence the "principal's office" comment—the record fails to show inappropriate pressure to reach a unanimous verdict.

---

[13] In *Zabriskie*, we affirmed the district court's decision to speak separately with an individual juror. But we ultimately reversed the conviction because, during the one-on-one meeting with the juror, the court gave an individualized *Allen* instruction just to that juror. *See* 415 F.3d at 1148.

35

d. Allen *instruction*

Mr. Coulter suggests that the district court's giving the *Allen* instruction was coercive and deprived him of his right to a unanimous verdict. Aplt. Br. at 43-46.[14]

i. Legal background – *Allen* instructions

A district court may deliver an *Allen* instruction to encourage deliberation. *See Allen v. United States*, 164 U.S. 492 (1896) (approving an instruction encouraging a deadlocked jury to continue deliberating). An *Allen* instruction "urg[es] deadlocked jurors to review and reconsider the evidence in the light of the views expressed by other jurors so as to avoid a mistrial." *Cornelius*, 696 F.3d at 1321 (quoting *United States v. LaVallee*, 439 F.3d 670, 689 (10th Cir. 2006)).

A district court must not deliver an "improperly coercive" *Allen* instruction. *Cornelius*, 696 F.3d at 1321. We consider four factors to assess whether an *Allen* instruction is improperly coercive: "(1) the language of the instruction, (2) whether

---

[14] In his motion for a mistrial, Mr. Coulter "respectfully submit[ted] his objection to another giving and/or instructing to go to a modified Allen instruction and/or an Allen instruction," which "would be impermissibly coercive." ROA, Vol. I at 482 (citation and quotations omitted). In its brief, the Government addresses this argument, stating "[i]t is not entirely clear that Coulter is challenging the trial court's decision to give the modified *Allen* instruction. However, to the extent that the coercive nature of *Allen* instructions was addressed in his motion for mistrial, it seems necessary to address this issue." Aplee. Br. at 54; *see id.* at 54-57. Although Mr. Coulter agreed with the wording of the instruction, ROA, Vol. III at 1010, we address his coerciveness objection to the district court's decision to give it. *See United States v. Ellzey*, 936 F.2d 492, 500 (10th Cir. 1991) (noting a distinction between a "general 'coercion' objection to [an] *Allen* instruction" and a specific objection to "certain language in the instruction").

the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." *Id*. (quotations omitted).

We elaborated on these factors in *Cornelius*. The language of an *Allen* instruction is not improperly coercive if it "urge[s] all jurors, not just those in favor of acquittal, to reconsider their views" and "stresse[s] the importance of integrity in being an impartial, deliberate fact-finder." *Cornelius*, 696 F.3d at 1322. When the district court presents an *Allen* instruction after other jury instructions, it should inform the jury "to apply the *Allen* instruction in conjunction with all of the instructions the court ha[s] previously given." *Id*. If the district court delivers an "*Allen* instruction after the jury informed the court that it was unable to reach a verdict," this "weighs against a determination of improper coercion." *Id*. (quotations omitted). After the district court delivers the instruction, a "relatively long period of further deliberation tends to negate an inference of improper coercion." *Id*. at 1323. Relatedly, if the jury remains deadlocked on some issues after receiving an *Allen* instruction, that fact "demonstrates that [the jury] was not compelled or coerced to reach a unanimous verdict." *United States v. Ailsworth*, 138 F.3d 843, 852 (10th Cir. 1998) (quotations omitted).

ii. Application

The district court did not abuse its discretion by delivering the *Allen* instruction. First, like the *Allen* instructions we have upheld in other cases, the court's instruction "urge[d] all jurors, not just those in favor of acquittal, to reconsider their views" and "stresse[d] the importance of . . . being an impartial,

37

deliberate fact-finder." *Cornelius*, 696 F.3d at 1322. And Mr. Coulter agreed to the language. ROA, Vol. III at 1010. Second, the district court told the jury to apply the *Allen* instruction in conjunction with all its previous instructions, which reduces the likelihood of coercion. *Id*. at 1322. Third, the court delivered the instruction only after the jury indicated it was deadlocked, which "weighs against a determination of improper coercion." *Id*. (quotations omitted). Fourth, the jury deliberated for several hours after the district court delivered the *Allen* instruction. *See* ROA, Vol. III at 1013-14. This "relatively long period" "tends to negate an inference of improper coercion." *Cornelius*, 696 F.3d at 1323; *see also LaVallee*, 439 F.3d at 689 ("several hours of deliberation" following an *Allen* instruction indicates that the instruction did not coerce the jury to reach a verdict). Finally, although the jury reached a unanimous verdict on the first two counts, it remained deadlocked on Count 3, which "demonstrates that it was not compelled or coerced to reach a unanimous verdict." *Ailsworth*, 138 F.3d at 852 (quotations omitted).

\*    \*    \*    \*

The district court handled its post-trial jury interactions without abusing its discretion.

### E. *Cumulative Error*

Mr. Coulter argues that the cumulative effect of the errors he alleges deprived him of due process. Aplt. Br. at 49. We disagree.

A defendant is entitled to reversal on cumulative error grounds if the cumulative effect of the errors he identifies rendered "the trial [] so fundamentally unfair as to deny

[him] due process." *United States v. Christy*, 916 F.3d 814, 840 (10th Cir. 2019)

(quotations omitted). "We consider cumulative error only if the appellant has shown at

least two errors that were harmless." *Id*. at 827. Then the "question [becomes] whether

the two or more harmless errors together constitute prejudicial error." *Id*.

Based on the discussion above, we have identified only one putative error that

we resolved as harmless: the district court's admission of hearsay testimony from

Ms. Mullins regarding Ms. Diaz's death. Because Mr. Coulter has failed to show "at

least two errors that were harmless," *Christy*, 916 F.3d at 827, we need not progress

further in the cumulative error analysis.

## III. CONCLUSION

We affirm the district court.